**PEDIATRIX MEDICAL GROUP, INC., Pediatrix Medical Group of Texas, P.A., Luis Alberto Ayo, M.D., Roy John Caviglia, M.D., Fortunato Perez–Benavides, M.D., and Jose Bernardo Arellano, M.D., Appellants,**

v.

**Gabriela Saenz ROBINSON, as Next of Friend of Ruben Pinales, Appellee.**

No. 05–10–01546–CV.

Court of Appeals of Texas, Dallas.

Oct. 31, 2011.

Jennifer Gossom Martin, Schell Cooley LLP, Scott P. Brinkerhoff, Addison, TX, Russell W. Schell, Schell Cooley LLP, Dallas, TX, for Appellants.

Domingo Garcia, Law Office of Domingo Garcia, P.C., Elizabeth M. Fraley, Fraley & Fraley, L.L.P., James E. Girards, The Girards Law Firm, Lawrence R. Lassiter, Miller Weisbrod, L.L.P., Dallas, TX, Paul M. Bracken, Robles, Bracken & Hughes, LLP, El Paso, TX, for Appellee.

Before Justices MORRIS, O'NEILL, and FILLMORE.

## OPINION

Opinion By Justice O'NEILL.

Appellants Pediatrix Medical Group, Inc., Pediatrix Medical Group of Texas, P.A., Luis Alberto Ayo, M.D., Roy John Caviglia, M.D., Fortunato Perez–Benavides, M.D., and Jose Bernardo Arellano, M.D. (collectively referred to as "appellants") appeal the trial court's orders denying their motion to dismiss and overruling

their objections to two expert reports filed by appellee Gabriela Saenz Robinson, as next of friend of Ruben Pinales. We affirm the trial court's orders.

### Factual and Procedural Background

Ruben Pinales was born prematurely on June 28, 2000. His gestational age was twenty-five weeks old, which put him at a high-risk of developing retinopathy of prematurity ("ROP"). This condition can result in blindness in premature babies if not timely diagnosed and treated.

After his birth, Ruben was immediately transferred to the neonatal intensive care unit within Providence Memorial Hospital. He was first examined by Dr. Jorge Fabio Llamas–Soforo ("Dr. Llamas") on August 2, 2000. Dr. Llamas found incomplete vascularization and fetal fundi in the eyes, and his notes indicated a follow-up should occur in four weeks. Dr. Llamas performed a follow-up exam on August 25, 2000 and found increased vascularization and noted he would follow up the next week before leaving town. The next week, on August 31, 2000, Dr. Llamas examined Ruben and found increased vascularization with Grade I ROP, 360 degrees in both eyes with no plus disease. He stated, "I will re-evaluate pt as soon as I return from OOT."

Dr. Llamas did not re-evaluate Ruben until September 25, 2000. During the exam, Dr. Llamas diagnosed Ruben with "Grade III ROP in right eye, 7 o'clock to 10 o'clock with Grade II ROP in the rest of the eye, no plus disease." On the left eye, he found "Grade III ROP from 3 o'clock to 6 o'clock with the remainder of the left eye Grade II ROP, no plus disease."

While in the NICU, neonatologists Dr. Ayo, Dr. Arellano, Dr. Caviglia, and Dr. Perez–Benavides cared for Ruben. None of these doctors' progress notes made any notation regarding Dr. Llamas's August 31, 2000 examination where he found ROP in both eyes.

On September 27, 2000, Ruben was discharged from Providence Memorial Hospital with instructions to follow-up with Dr. Llamas on October 2, 2000. During the October visit, Dr. Llamas continued to note ROP in both eyes. During Ruben's November 2, 2000 visit, Dr. Llamas described the condition as active cicatricial ROP stage II in both eyes with mild dragging of the macula in the left eye.

In September 2001, Ruben's care and treatment was transferred to Dr. Violeta Radenovich, a pediatric ophthalmologist. She diagnosed him as having ROP in both eyes, retinal detachment in the right eye, and severe scarring and macular traction in the left eye. Dr. Radenovich determined Ruben was legally blind.

Appellee originally sued Dr. Llamas, Dr. Ayo, Pediatrix Medical Group, Inc., Pediatrix Medical Group of Texas, P.A., and other healthcare providers for damages allegedly arising from the acts of medical negligence relating to the screening and treatment of Ruben's ROP. Because the lawsuit fell under chapter 74 of the Texas Civil Practice and Remedies Code, appellee filed two expert reports in support of her claim: one report from Dr. Sandra Brown and a second report from Dr. Marcus Hermansen. Dr. Ayo and the Pediatrix entities filed objections to the sufficiency of the reports.

Almost a year later, appellee amended her petition and added Dr. Caviglia, Dr. Perez–Benavides, and Dr. Arellano as defendants. She then filed an expert report from Dr. William V. Good, a board certified ophthalmologist specializing in pediatric ophthalmology and a second report from Dr. Maureen Sims, a neonatologist, which related to all appellants. Appellants again filed objections and moved to dismiss the lawsuit pursuant to section 74.351(b) of the civil practice and remedies code.

Appellee responded both reports constituted an objective good faith effort to comply with the statutory requirements of chapter 74. After a hearing, the trial court overruled appellants' objections to Dr. Good's and Dr. Sims's reports and denied their request for dismissal. The trial court entered an order on November 8, 2010. Appellants filed an accelerated, interlocutory appeal, cause number 05–10–01546–CV, challenging that order.

While 05–10–01546–CV was pending in this Court, the trial court entered an order on March 23, 2011 granting Dr. Ayo and the Pediatrix entities' objections to Dr. Brown's and Dr. Hermansen's expert reports, but allowed thirty days for appellee to supplement and cure any deficiencies. Appellee then supplemented with the exact same reports of Dr. Sims and Dr. Good that she previously filed after amending her petition. The trial court denied their objections on August 18, 2011.

During oral argument in cause number 05–10–01546–CV, appellants informed this court of their intent to file an accelerated notice of appeal as to the trial court's August 18, 2011 order. They also conceded the issues regarding Dr. Good's and Dr. Sims's expert reports would be the same for both appeals; therefore, the appeals should be consolidated.[1] This Court notified the parties of its intent to consolidate cause numbers 05–10–01546–CV and 05–11–01219–CV. Accordingly, the following analysis and opinion applies to both the trial court's November 8, 2010 order and its August 18, 2011 order.

## Standard of Review and Applicable Case Law

Courts of appeals apply an abuse of discretion standard in reviewing a trial court's decision with respect to chapter 74 expert reports and the qualifications of experts. *See Am. Transitional Care Ctrs. of Tex. v. Palacios*, 46 S.W.3d 873, 876 (Tex.2001); *Broders v. Heise*, 924 S.W.2d 148, 151 (Tex.1996); *Baylor Univ. Med. Ctr. v. Rosa*, 240 S.W.3d 565, 569 (Tex. App.-Dallas 2007, pet. denied). When reviewing matters committed to the trial court's discretion, an appellate court may not substitute its judgment for that of the trial court. *Rosa*, 240 S.W.3d at 569. However, a clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion. *Id.*

Section 74.351(r)(5) defines "expert" as a physician or a person practicing health care in a field of practice involving the same type of care or treatment. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(5) (West 2011). A person may qualify as an expert with respect to medical standards of care when the person (1) is practicing medicine at the time the testimony is given or was practicing medicine at the time the claim arose; (2) has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and (3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care. TEX. CIV. PRAC. & REM.CODE ANN. § 74.401(a) (West 2011). The court may also consider whether the witness is board certified in an area relevant to the claim and whether the physician is actively practicing medicine in the areas relevant to the claim. *Id.* § 74.401(c).

▮▮ Under the requirements set out in section 74.401, the proper inquiry con-

---

1. Appellants also abandoned their argument regarding whether appellee timely served Dr. Good's and Dr. Sims's expert reports on Dr. Ayo and the Pediatrix entities.

cerning whether a physician is qualified to testify is not the physician's area of practice but the stated familiarity with the issues involved in the claim before the court. *Concentra Health Serv., Inc. v. Everly,* 2–08–455–CV, 2010 WL 1267775, at *4 (Tex.App.-Fort Worth Apr. 1, 2010, no pet.) (mem. op.). Thus, a physician "who is not of the same school of medicine [as the defendant] ... is competent to testify if he has practical knowledge of what is usually and customarily done by a practitioner under circumstances similar to those confronting the defendant." *Id.* Further, the party offering the expert's testimony bears the burden to prove the witness is qualified under Texas Rule of Evidence 702. *Broders,* 924 S.W.2d at 151; *see* Tex.R. Evid. 702 (requiring that experts be qualified "by knowledge, skill, experience, training, or education," and that their testimony "assist the trier of fact").

▆▆▆ A trial court must grant a motion to dismiss under section 74.351(b) of the civil practice and remedies code only if the expert report does not represent an objective good faith effort to comply with the definition of an expert report as set out in section 74.351(r)(6). *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(*l*) (West 2011); *Palacios,* 46 S.W.3d at 878. The statutory definition requires the expert to provide a "fair summary" of his or her opinions regarding the applicable standards of care, the manner in which the care rendered failed to meet those standards, and the causal relationship between that failure and the injury, harm, or damages claimed. Tex. Civ. Prac. & Rem.Code Ann. § 74.351(r)(6) (West 2011). The report is meant to serve two purposes: (1) to inform the defendant of the specific conduct the claimant is questioning and (2) to provide a basis for the trial judge to conclude the claims have merit. *Palacios,* 46 S.W.3d at

879. Because the statute focuses on what is required in the report, the only information relevant to determining whether a report complies with the statute is within the four corners of the document. *Id.* at 878; *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002). The trial judge may not draw inferences. *Rosa,* 240 S.W.3d at 570.

The statute does not require that a single expert report address all liability and causation issues with respect to a health care provider. In fact, section 74.351(i) provides:

> Notwithstanding any other provisions of this section, a claimant may satisfy any requirement of this section for serving an expert report by serving reports of separate experts regarding different physicians or health care providers or regarding different issues arising from the conduct of a physician or health care provider, such as issues of liability and causation. Nothing in this section shall be construed to mean that a single expert must address all liability and causation issues with respect to all physicians or health care providers or with respect to both liability and causation issues for a physician or health care provider.

Tex. Civ. Prac. & Rem.Code Ann. § 74.351(i) (West 2011); *Rosa,* 240 S.W.3d at 570.

▆▆▆ Further, the report does not need to contain all of the plaintiff's proof. *Fagadau v.Wenkstern,* 311 S.W.3d 132, 138 (Tex.App.-Dallas 2010, no pet.). Nor does it have to meet the same requirements as evidence submitted in a summary judgment proceeding. *Id.* But it must do more than merely state the expert's conclusions about the standard of care, breach, and causation. *Id.* The expert must explain the basis of his statements and link his conclusions to the facts. *Id.*

Accordingly, when a plaintiff timely files an expert report and a defendant objects

to the report and/or seeks a dismissal because of alleged inadequacies, the trial court may grant the motion "only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report in Subsection (r)(6)." TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(*l*).

## Dr. Good's Expert Report

█ In their first issue, appellants argue the trial court erred by overruling their objections to Dr. Good's expert report because he provided only conclusory statements regarding the causal relationship between the alleged breaches of the standard of care and Ruben's blindness. Appellants contend Dr. Good provides conclusory statements regarding (1) why their failure to ensure proper follow-up examinations between the "critical time period" of August 31, 2000 and September 25, 2000 resulted in Ruben's blindness and (2) how appellants' failure to establish policies and procedures for ROP examinations caused Ruben's injury. Appellee responds the report represents an objective good faith effort to comply with the definition of "expert report," as defined under section 74.351(r). We agree with appellee.

Appellants have not challenged Dr. Good's qualifications as an expert; therefore, we only focus on whether his report adequately addresses causation. Having carefully reviewed Dr. Good's expert report, we conclude his opinions about the critical time period for follow-up examinations and appellants' failure to establish policies and procedures for ROP examinations are not conclusory but tied to specific facts. We find appellee's reliance on *Fagadau v. Wenkstern*, 311 S.W.3d 132 (Tex. App.-Dallas 2010, no pet.) instructive.

In that case, Dr. Fagadau diagnosed Wenkstern on August 23, 2006 with a posterior vitreous detachment of the eye but noted no retinal detachment. *Id.* at 134. He recommended a follow-up appointment in six months to a year but told Wenkstern to call if he experienced any significant changes. *Id.* On September 25, Wenkstern called Dr. Fagadau because he experienced a surge of floaters. *Id.* Wenkstern was referred to another doctor, who diagnosed him with a detached retina. Wenkstern filed suit against Dr. Fagadau contending, among other things, that he was negligent in failing to schedule a follow-up appointment in a reasonably prudent manner under the circumstances. *Id.*

Wenkstern filed an expert report by Dr. Daniel Goldman, an opthalmologist specializing in diseases and surgery of the retina. Dr. Goldman opined that Wenkstern "should have been seen at least within the first two weeks after the exam of 8/23/06" and "scheduling the patient for a six-month to one year follow-up was below the standard of care." *Id.* He further stated that "because Wenkstern was not examined and treated soon enough, he developed Retinal Detachment requiring several surgeries ... if the tears were noted sooner, they could have been treated with laser and all the subsequent Retinal Detachment surgeries avoided." *Id.*

Dr. Fagadau objected to the report and argued Dr. Goldman's opinion on causation was wholly conclusory with respect to causation because he did not provide an exact date of the retinal detachment. *Id.* at 138. On appeal, this court held the report sufficiently linked Dr. Fagadau's conduct to Wenkstern's injuries. *Id.* at 139. Although the report did not give an exact date of the retinal detachment, the report clearly opined re-examination within two weeks would have prevented Wenkstern's injuries. *Id.* Thus, the trial court did not err in denying Dr. Fagadau's motion to dismiss. *Id.*

Appellants argue *Fagadau* highlights the deficiencies in Dr. Good's report. For example, they claim it was a logical assumption for Dr. Goldman to opine that Wenkstern's retinal detachment occurred between August 23 and September 25 because no detachment was observed on August 23 and then retinal detachment was observed on September 25. However, under the present facts, Dr. Good failed to explain how or why he concluded Ruben's ROP reached threshold, requiring intervention, between August 31 and September 25, as opposed to a later date. As discussed below, we disagree with appellants' argument.

Dr. Good stated he is familiar with the standard of care for neonatologists who care for babies at risk for ROP. He further noted the American Academy of Pediatrics has made clear the standards of care for neonates at risk for ROP overlap between neonatologists and ophthalmologists. He has personally been involved in developing ROP policies and procedures for NICUs. He noted that each appellant had a duty, given the standard of care, to ensure that Ruben received appropriate and timely ROP exams and treatment. In order to do this, appellants needed to do the following: (1) be familiar with and monitor Ruben's ROP examinations, care, and treatment; (2) communicate with the ophthalmologist performing ROP examinations and treatment; and (3) be familiar enough with ROP to know that once the disease is diagnosed in a premature infant, as occurred on August 31, 2000, it can progress rapidly. Because it can progress rapidly, "it is imperative that a follow-up examination take place no more than two weeks later." Dr. Good explained the standard of care required appellants to ensure another qualified ophthalmologist would care for Ruben in Dr. Llamas's absence.

Dr. Good stated Ruben had active ROP as of August 31, 2000 that necessitated re-examination within two weeks, and "[t]o a reasonable medical probability, during the period between 8/31/00 and 9/25/00, Ruben's eyes reached and passed the threshold level of ROP without treatment." Although appellants argue Dr. Good's determination that this is the critical time frame for when Ruben should have received treatment to prevent further development of ROP is conclusory, Dr. Good noted in his report that seven days later, on October 2, 2000, Dr. Llamas recorded "disc with moderate amount of dragging" for the right eye and such a diagnosis "indicates a late (involutional) stage in the natural history of severe ROP. It does not occur with mild ROP." In addition, Dr. Good noted that Dr. Llamas's subsequent outpatient examinations noted "cicatricial ROP," and in order to reach this level of ROP, a patient must pass through a level of active ROP severe enough to warrant treatment. Based on his review of Dr. Llamas's notes and his familiarity with the progression of ROP, Dr. Good concluded that "to a reasonable medical probability, that level of ROP severe enough to warrant treatment occurred between the period of 8/31/00 and 9/25/00 when no examinations were provided to Ruben."

In addition, Dr. Good stated that had appellants implemented policies and procedures related to the care and treatment of ROP, Ruben would have received timely treatment to salvage his vision. Dr. Good noted that Dr. Ayo and the Pediatrix entities had a duty to establish policies and procedures to ensure timely ROP follow-up examinations and treatment. In this case, there were no such policies and procedures in place to ensure Ruben received the proper treatment during the recommended time frame. This failure led to misplaced reliance on Dr. Llamas's diag-

nostic services. Dr. Good opined that, based on these failures, appellants proximately caused Ruben's blindness.

■ Although appellants disagree with Dr. Good's determination of the "critical time frame" for when Ruben passed the threshold for ROP treatment, such a disagreement does not render Dr. Good's opinions on causation conjectural. Furthermore, the fact that appellee may not prove causation at trial does not make Dr. Good's expert report inadequate. The possibility that facts may later be discovered to prove his opinions on causation are incorrect is not a basis for holding the report insufficient under section 74.351. See, e.g., Fagadau, 311 S.W.3d at 139; Methodist Hosp. v. Shepherd–Sherman, 296 S.W.3d 193, 198 (Tex.App.-Houston [14th Dist.] 2009, no pet.) (noting that although discovery could later prove doctor's opinion wrong, it is not a basis for holding report insufficient under chapter 74).

Dr. Good's report describes what appellants should have done and what happened because they failed to do it. Similar to the expert report in Fagadau, Dr. Good sufficiently linked facts to the alleged conduct causing Ruben's blindness and identification of a more specific time frame for the resulting injury is not required in order for the expert report to pass muster under section 74.351. See Fagadau, 311 S.W.3d at 139 (noting that although the report did not give an exact date of retinal detachment, it clearly opined that a re-examination within two weeks would have prevented the detachment). As such, the report clearly constitutes a good faith effort to provide a fair summary of his opinions on causation. It informs appellants of the specific conduct appellee is questioning and provides a basis for the trial court to determine whether the claims have merit. See Fagadau, 311 S.W.3d at 139. Accordingly, the trial court did not err in overruling appellants' objections to Dr. Good's expert report and denying their motion to dismiss. Appellants' first issue is overruled.

## Dr. Sims's Expert Report

In their second issue, appellants contend Dr. Sims is unqualified to render opinions on causation, and even if she is qualified, her opinion is inadequate because it relies entirely on Dr. Good's deficient report. Appellee responds Dr. Sims's report sufficiently establishes her qualifications to opine on the applicable standard of care, breaches of the standard of care, and causation. Further, her opinions are not conclusory.

Appellants claim Dr. Sims's training and experience as a neonatologist does not provide her sufficient expertise to opine that the cause of Ruben's blindness was the untimely diagnosis and treatment for ROP. They further argue her report and curriculum vitae fail to show she had knowledge, either from experience or study, concerning the effectiveness of ROP treatments in general or in Ruben's particular case. Appellants argue the Texas Supreme Court's decision in Broders v. Heise is instructive. See Broders v. Heise, 924 S.W.2d 148 (Tex. 1996). Appellee responds that appellants essentially object to Dr. Sims providing causation opinions because she is not an ophthalmologist; however, such a narrow view of expert qualifications should be rejected, citing Livingston v. Montgomery, 279 S.W.3d 868 (Tex.App.-Dallas 2009, no pet.).

In Broders v. Heise, a family filed a wrongful death suit against a hospital and emergency room physicians for their failure to promptly diagnose and treat the decedent's head injury. Id. at 150. At trial, the family called an emergency room doctor as an expert and claimed he was qualified to testify because (1) he was

trained in the brain and its function, (2) he had experience in treating head injuries, and (3) he understood what services a neurosurgeon could provide in order to know what type of physician to recommend. *Id.*

The supreme court concluded the expert failed to meet the requirements of rule 702. While the expert stated he knew both that neurosurgeons should be called to treat head injuries and what treatments they could provide, he never testified that he knew, from either experience or study, the effectiveness of those treatments in general, let alone in that case. Thus, the plaintiffs did not establish that the expert's opinions on causation would have risen above mere speculation to offer genuine assistance to the jury. *Id.* at 153.

In *Livingston v. Montgomery*, appellees sued doctors and a nurse after their son suffered severe neurological injuries as a result of medical malpractice committed during labor and delivery. *Livingston*, 279 S.W.3d at 869. Appellees filed an expert report of an OB/GYN, and the appellants challenged it arguing the expert was not qualified to opine "as to causation of neurological injuries or conditions-much less pediatric neurological injuries." *Id.* at 871. This court analyzed *Broders v. Heise* and concluded it was distinguishable.

> The issue here is not who is qualified to testify about whether a neurologist could have saved the patient's life by treating her neurological injuries as in *Broders*. Instead, as in *Mosely*, the causation issue here relates to the duty of health care providers to recognize potential harm and take appropriate actions.

*Id.* at 877; *see Mosely v. Mundine*, 249 S.W.3d 775, 781 (Tex.App.-Dallas 2008, no pet.) (holding emergency room doctor was qualified to opine on failure of doctor to detect lung cancer based on abnormal chest x-ray because expert had experience, skill, knowledge, and education regarding scope of practice of an emergency room doctor even though he had no training in diagnosing or treating cancer). Because the expert had experience in managing labor and delivery, his expertise qualified him to opine on the causal relationship between labor and delivery and the complications that stem from labor and delivery, including a newborn's neurological injuries. *Id.*

Here, Dr. Sims stated she is a board-certified pediatrician and neonatologist and has been involved in the development of standard of care policies and procedures for the care of premature babies for the past twenty years. She further provided the following background and experience in her report:

> I have personally treated small preterm newborns like Ruben Pinales, and I'm familiar with the standards of care for treating such small infants, both at the physician level and the hospital/nursing/staffing level, with respect to policies and procedures for ensuring screening for retinopathy of prematurity (ROP). I have requested ophthalmologic consultations from pediatric ophthalmologists to screen preterm infants for ROP, and I have developed the necessary policies and procedures to ensure a baby at risk for ROP obtains the necessary care and treatment he or she needs.

She explained the standard of care required each neonatologist caring for Ruben to communicate with the ophthalmologist performing his ROP examinations and treatment. She explained the communication breakdown between the doctors when Dr. Llamas first diagnosed ROP and the lack of continuity of care resulted in "Ruben not [being] examined during the critical period of time between August 31 and September 25."

■ Similar to this court's reasoning in *Livingston*, we conclude Dr. Sims's report establishes her qualifications to opine on causation. While she is not a pediatric ophthalmologist specializing in the diagnosis and treatment of ROP, the causation issue here relates to the duty of the neonatologists to have recognized the potential for Ruben to develop ROP, to have worked closely with Dr. Llamas regarding Ruben's treatment, to have recognized the potential harm for a delay in follow-up appointments, and to have taken the appropriate actions to ensure Ruben was seen by an appropriate doctor during the critical time frame. Based on her treatment of small preterm babies like Ruben, her experience in requesting ophthalmologic consultations to screen preterm babies for ROP, and her familiarity with implementing policies and procedures to ensure proper care for babies at risk for ROP, she is qualified to provide her expert opinion. *See Concentra Health Serv., Inc.,* 2010 WL 1267775, at *3 (noting the proper inquiry is not the physician's area of practice but the familiarity with the issues involved in the claim before the court).

In reaching this decision, we reject appellants' reliance on *Broders* and their argument that a neonatologist who requests "ophthalmologic consultations," like an emergency room doctor who knows a neurosurgeon should be called to treat head injuries, fails to demonstrate the expertise on the issue of cause in fact to satisfy the requirements of rule 702. The overriding standard established in *Broders* was "whether the offering party [has] establish[ed] that the expert 'has knowledge, skill, experience, training, or education' regarding the specific issue before the court which would qualify the expert to give an opinion on that particular subject." *Broders,* 924 S.W.2d at 153. Dr. Sims has met this standard.

Dr. Sims explained she has experience in treating newborns like Ruben and in ensuring a baby at risk for ROP receives the necessary treatment and care. Dr. Sims opined that, because Ruben did not receive the proper treatment, the lack of such treatment caused his blindness. Similar to *Livingston,* which turned on the OB/GYN's ability to identify outcomes resulting from negligence during labor and delivery, Dr. Sims appreciated that in the face of untimely screening and treatment, ROP would cause Ruben's blindness. Accordingly, the trial court did not abuse its discretion in overruling appellants' objections to Dr. Sims's expert report.

Appellants also argue Dr. Sims's causation opinion is inadequate because she relies entirely on Dr. Good's deficient report; therefore, her causation opinion collapses along with Dr. Good's for lack of a proper foundation. Having concluded Dr. Good's expert report sufficiently establishes causation for purposes of chapter 74, appellants' argument is without merit. Accordingly, appellants' second issue is overruled.

### Inconsistencies of Reports

■ In their final issue, appellants argue Dr. Sims and Dr. Good's reports are impermissibly inconsistent with the expert report of Dr. Sandra Brown. They argue appellee originally attacked the competency of the care provided by Dr. Llamas and filed an expert report by Dr. Brown in support of her allegations. Not until she later amended her petition and added the appellant neonatologists did she then file the expert reports of Dr. Good and Dr. Sims attacking the neonatologists' failure to monitor and document Dr. Llamas's findings about Ruben's ROP. Appellants argue appellee cannot have it both ways. Appellee should not be allowed to argue that the neonatologists failed to monitor and document findings about Ruben's ROP

when the findings would have been inaccurate based on Dr. Llamas's failure to properly diagnose and monitor Ruben's ROP.

After reviewing all three reports, we do not agree Dr. Brown's expert report creates any inconsistencies. Dr. Brown states in her report:

The failure of Dr. Ayo and the NICU physicians and nurse practitioners to take note of Dr. Llamas' examination on 8/31/2000 indicating the rapid development of active ROP in an extremely preterm and sickly infant, and to ensure that re-examination occurred within 2 weeks and ideally within 1 week, was a breach of the standard of care.

. . .

It is unacceptable that the examination schedule should be predicated upon whether or not the customary screening ophthalmologist was in town. . . . It is almost certain that Baby Ruben's ROP met and exceeded Threshold severity before or within the interval between 8/31/2000 and 9/25/2000, when he received no screening examinations.

. . . .

In conclusion, Drs. Ayo and Llamas and Providence Memorial Hospital breached the standard of care in numerous ways, and thereby failed to bring about properly timed screening, accurate diagnosis, and effective therapy for Baby Ruben's ROP.

Regardless of Dr. Brown's opinions and criticisms of Dr. Llamas in his diagnosis of ROP, her opinions are not inconsistent with Dr. Good's and Dr. Sims's opinion regarding the appellants' failure to meet their responsibilities under the applicable standard of care regarding treatment and screening for early intervention to prevent blindness from ROP. Similar to Dr. Brown, both Dr. Sims and Dr. Good explained that had appellants closely documented and screened Ruben's ROP, they would have seen that Ruben needed a timely follow-up during the critical period between August 31 and September 25, and in all reasonable medical probability, this would have prevented blindness.

■ Appellants cite *Gray v. CHCA Bayshore L.P.*, 189 S.W.3d 855 (Tex.App.-Houston [1st Dist.] 2006, no pet.) for the proposition that a court may consider whether reports appear to be inconsistent and fail to put the defendants on notice as to who had what responsibility and how that defendant departed from the standard of care causing damages. While we agree with the general proposition of the case as cited by appellants, we do not find it persuasive under these facts.

In *Gray*, the plaintiff sued doctors for knee injuries that occurred during surgical treatment for chronic sinusitis and nasal septal deformity. *Id.* at 856. She filed an expert report, and the trial court dismissed her claim for failing to comply with section 74.351 of the civil practice and remedies code. *Id.* On appeal, the court of appeals held the expert report was conclusory and contained inconsistencies. Specifically, the expert opined the applicable standard of care breached by defendants was "monitor[ing] the positioning of the patient's extremities," and then later departed from this limited standard of care and breach by stating in the report that "the failure to monitor, detect, diagnose, and timely treat a malpositioned left knee during general anesthetic was negligence, and proximately caused the dislocated left patella." *Id.* at 859. Because of these inconsistencies in the same report, the report failed to put the parties on notice as to who had what responsibility and how that person or persons departed from the standard of care and caused injury. *Id.* The trial court also concluded the report did not satisfy section 74.351 because it was conclusory. The court's holding was not based on inconsistency alone. *Id.*

We first note, unlike *Gray*, appellants are not claiming any inconsistencies within the *same* report, but rather they are arguing inconsistencies among different reports. Regardless of this distinction, as stated above, the reports are not inconsistent. Moreover, we have also concluded the reports are not conclusory. Thus, unlike the report in *Gray*, the reports in this case sufficiently put appellants on notice as to who had what responsibility and how they departed from the standard of care causing Ruben's blindness. Accordingly, we are not persuaded by the holding in *Gray*. Appellant's third issue is overruled.

**Conclusion**

After a thorough examination of the expert reports and applicable law, we conclude the reports sufficiently inform appellants of the specific conduct appellee is questioning and provides a basis for the trial court to determine whether the claims have merit. Accordingly, the trial court did not err in overruling appellants' objections to the expert reports and denying their motion to dismiss. We affirm the trial court's November 8, 2010 and August 18, 2011 orders.