COURT OF APPEALS

EIGHTH DISTRICT OF TEXAS

EL PASO, TEXAS




ROY JOHN CAVIGLIA, M.D.,
FORTUNATO PEREZ-BENAVIDES,
M.D., AND JOSE BERNARDO
ARELLANO, M.D.,


 Appellants,


v.


TANIKA TATE, AS NEXT FRIEND OF
ELIJAH MENDEZ, 


 Appellee.
§


 


§


 


§


 


§


 


§


 


 § 


No. 08-10-00256-CV



Appeal from the


County Court at Law No. 6 


of El Paso County, Texas 


(TC # 2009-4649) 



O P I N I O N


 In this health care liability case, Appellants Dr. Roy John Caviglia, Dr. Fortunato Perez-Benavides, and Dr. Jose Bernardo Arellano filed written objections to the adequacy of Appellee
Tanika Tate's expert reports, and asked that her claims be dismissed with prejudice because of that
alleged inadequacy. The trial court, after hearing argument, issued orders overruling Appellants'
objections. We affirm.

BACKGROUND (1)


 On February 29, 2000, Appellee, who was then in her twenty-fifth week of pregnancy, gave
birth to a tiny baby boy, Elijah Mendez. Mendez weighed less than 1.5 pounds at birth and was
immediately placed in the neonatal intensive care unit ("NICU") of Providence Memorial Hospital
in El Paso, Texas. Because of his extreme prematurity, Mendez was at risk for an eye disease known
as retinopathy of prematurity ("ROP"). (2)

 On April 3, 2000, Dr. Jorge Llamas-Soforo, an ophthalmologist in the Providence NICU,
examined Mendez's eyes and found no indication of ROP. On May 1, 2000, Dr. Llamas-Soforo
examined Mendez's eyes again and still found no indication of ROP. On May 22, 2000, however,
Dr. Llamas-Soforo examined Mendez's eyes a third time and found ROP in both of them. On May
25, 2000, Dr. Llamas-Soforo performed laser surgery on Mendez's eyes, but the surgery did not save
Mendez from permanent legal blindness. (3)

 On October 19, 2009, Appellee, as next friend of Mendez, filed a lawsuit against Dr. Llamas-

Soforo, Dr. Luis Ayo, (4) Providence Memorial Hospital, and others, alleging negligence that
proximately caused Mendez's legal blindness. Appellee later amended her petition to add Dr. Vibha
Honkan and Appellants as defendants. Dr. Honkan and Appellants were all neonatologists who
worked in the Providence NICU during the time Mendez was a patient there.

 Appellee timely served on Appellants two expert reports, one written by Dr. William Good,
a pediatric ophthalmologist who practiced in California, and one written by Dr. Maureen Sims, a
neonatologist who also practiced in California. Appellants timely filed written objections to the
adequacy of the two expert reports and asked that Appellee's claims be dismissed with prejudice
because of that alleged inadequacy. In their objections to Dr. Good's report, Appellants argued that
he had "fail[ed] to show any causal link" between their alleged negligence and Mendez's blindness. 
 In their objections to Dr. Sims' report, Appellants argued that she was "[n]ot qualified to opine as
to [c]ausation" and that, in any event, she too had "failed to explain [how their] alleged negligence
proximately caused Elijah's blindness."

 The trial court later held a hearing on Appellants' objections. At that hearing, Appellants
argued as follows:

 This case involves ROP, which is an eye disease of very premature babies. 
Only a handful of ophthalmologists treat ROP. Neonatologists do not treat it. They
can treat the baby that has ROP; but as far as ROP itself goes . . . not even all
ophthalmologists treat it. It is a very complex disease.

 And so Dr. Sims, who is a neonatologist, attempts in her report to opine as
to causation in this case. And we first object to her qualifications to be able to opine
to that because she has no experience, background, [or] training in treating ROP and
saying how any breaches of the neonatologist actually caused any blindness through
the ROP.

 Additionally, we also object to the actual opinions themselves as being
conclusory. Essentially what Dr. Sims says is that the babies allegedly weren't
screened timely and now the baby is blind. There is no testimony as to how that ROP
- or how that delay caused any blindness. That doesn't . . . inform any of these
defendants as to how their alleged breaches caused any of this plaintiff's injuries.

 With respect to Dr. Good's report, we object to his opinions regarding
causation as also being conclusory. His opinions are essentially the same as Dr.
Sims', and basically it doesn't inform the defendants as to how any of their alleged
breaches caused any of the plaintiff's injuries.


 Appellee responded to Appellants' arguments as follows:

 [W]hat the report is supposed to do is demonstrate to the Court that the case
has some merit. You've got some experts out there who are willing to go and make
a report and show that there's some merit to the claim and also put the defendants on
notice of the conduct that's being called into question. In doing that under Chapter
74 [of the Texas Civil Practice and Remedies Code], you're supposed to produce a
report that talks about the standard of care, breaches of the standard of care and
causation for each of the defendants.

 . . .



 In their objections . . . the defendants acknowledge that the neonatologist Dr.
Sims is qualified to opine about the standard of care for neonatologists and the
breaches; and they've also acknowledged that Dr. Good, a recognized expert in
ophthalmology, is qualified to opine about causation. When you put the two reports
together, you have standard of care and breach and causation which meets the
Chapter 74 requirements.


 At the conclusion of the hearing, the trial court overruled Appellants' objections to the two
expert reports. Appellants later filed timely notices of interlocutory appeal. See Tex. Civ. Prac.
& Rem. Code Ann. § 51.014(a)(9) (West 2008).

DISCUSSION

 On appeal to this Court, Appellants bring two issues, in which they argue that the trial court
erred in overruling their objections to the two reports. With respect to the adequacy of those reports,
Appellants and Appellee make essentially the same arguments that they made below. In addition,
however, Appellee asks that we award her damages because Appellants' appeal is frivolous. See
Tex. R. App. P. 45.

STANDARD OF REVIEW

We review a trial court's Section 74.351 ruling for an abuse of discretion. American
Transitional Care Ctrs. of Tex., Inc. v. Palacios, 46 S.W.3d 873, 877 (Tex. 2001). A trial court
abuses its discretion if it acts in an unreasonable or arbitrary manner, without reference to any
guiding rules or principles. Walker v. Gutierrez, 111 S.W.3d 56, 62 (Tex. 2003). A trial court acts
arbitrarily and unreasonably if it could have reached only one decision, but instead reached a
different one. See Teixeira v. Hall, 107 S.W.3d 805, 807 (Tex. App. - Texarkana 2003, no pet.). 
To that end, a trial court abuses its discretion when it fails to analyze or apply the law correctly. In
re Sw. Bell Tel. Co., 226 S.W.3d 400, 403 (Tex. 2007), citing In re Kuntz, 124 S.W.3d 179, 181
(Tex. 2003).RELEVANT LAW

 The plaintiff, in a health care liability lawsuit, must serve on each defendant one or more
expert reports, and associated curricula vitae, no later than 120 days after the petition is filed. Tex.
Civ. Prac. & Rem. Code Ann. § 74.351(a) (West 2011). For these purposes, an "expert report" is
a written report by an expert that provides a fair summary of the expert's opinions regarding
applicable standards of care, the manner in which the defendant failed to meet those standards, and
the causal relationship between the defendant's failure and the plaintiff's injury. Tex. Civ. Prac.
& Rem. Code Ann. § 74.351(r)(6) (West 2011). A plaintiff may satisfy any requirement for serving
an expert report by serving separate reports from different experts. Tex. Civ. Prac. & Rem. Code
Ann. § 74.351(i) (West 2011). Thus, a deficiency in one report may be made up in another report.

 An expert report and/or its accompanying curriculum vitae must establish that the report's
author is qualified to opine as an expert on the subject matter of the report. In re McAllen Med.
Center, 275 S.W.3d 458, 463 (Tex. 2008). The medical expert need not practice in the same 

specialty as the defendant in order to qualify as an expert. Roberts v. Williamson, 111 S.W.3d 

113, 122 (Tex. 2003). However, not every licensed physician is always qualified to testify on 

every medical question. Broders v. Heise, 924 S.W.2d 148, 152 (Tex. 1996). To be qualified to 

opine on the causal relationship (5) between the defendant's alleged failure to meet an applicable 

standard of care and the plaintiff's injury, the report's author must be a physician who is 

otherwise qualified to render opinions on such causal relationship under the Texas Rules of 

Evidence. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(5) (West 2011).

 Under Texas Rule of Evidence 702, an expert witness may be qualified on the basis of 

"knowledge, skill, experience, training, or education . . . ." The question of whether an expert 

witness is qualified under Rule 702 lies within the sound discretion of the trial court. Broders v. 

Heise, 924 S.W.2d 148, 151 (Tex. 1996). Thus, a medical expert from one specialty may be 

qualified to testify if he has practical knowledge of what is traditionally done by medical experts 

of a different specialty under circumstances similar to those at issue in the case. Keo v. Vu, 76 

S.W.3d 725, 732 (Tex. App. - Houston [1st Dist.] 2002, pet. denied). Certainly, if the subject matter
is common to and equally recognized and developed in all fields of practice, any practitioner familiar
with the subject may testify as to the standard of care. Id.; Blan, 7 S.W.3d at 745. However, the
proffered medical expert's qualifications must be evident from the four corners of his expert report
and curriculum vitae. See generally Palacios, 46 S.W.3d at 878; Christus Health Southeast Texas
v. Broussard, 267 S.W.3d 531, 536 (Tex. App. - Beaumont 2008, no pet.). The trial court must
ensure that a witness who purports to be an expert really does have expertise regarding the subject
about which he is offering an opinion. Palafox v. Silvey, 247 S.W.3d 310, 316 (Tex. App. - El Paso
2007, no pet.).

 A defendant may file written objections to the adequacy of an expert report. Tex. Civ. Prac.
& Rem. Code Ann. § 74.351(l) (West 2011). The trial court may sustain such objections only if it
finds, after a hearing, that the report does not represent an objective good faith effort to comply with
the statutory definition of an expert report (see above). Id. To represent an objective good faith
effort, the report must provide enough information to: (1) inform the defendant of the specific
conduct that the plaintiff has called into question and (2) allow the trial court to conclude that the
claim has merit. Palacios, 46 S.W.3d at 879. A report that merely states the expert's conclusions
about the standard of care, breach, and causation does not provide the necessary information. Id. 
On the other hand, a report does not have to meet the same requirements as the evidence offered in
a summary judgment proceeding or at trial. Id.

 A trial court's order denying a motion challenging the adequacy of an expert report is
reviewed on appeal for abuse of discretion. Id. at 877.

DR. GOOD'S REPORT


 Appellants argue that the trial court erred in overruling their objections to the adequacy of
Dr. Good's expert report because he failed "to provide a sufficiently specific description of the
causal relationship between each Appellant's individual acts and Appellee's alleged injury." 
Appellants do not challenge Dr. Good's qualifications or the adequacy of his discussion of the
applicable standard of care or the manner in which Appellants breached that standard; they complain
only about Dr. Good's discussion of causation.

 Dr. Good's report read, in relevant part, as follows:

 Baby Elijah was born on 2/29/00 at an estimated gestational age of 24 weeks 5 days,
with a birth weight of 650 grams. Baby Elijah was first examined by Dr. Llamas on
4/3/00, or between approximately 4-5 weeks of life. Dr. Llamas found no fungus in
the posterior pole and noted incomplete vascularization at 360 degrees. He
recommended follow-up in 4 weeks. Throughout the next month, it was noted in the
records that Elijah was at high risk for ROP and awaiting reassessment by Dr.
Llamas. Dr. Llamas re-examined Elijah on 5/01/00. At that time Dr. Llamas noted
Elijah's "increased vascularization, no ROP," and recommended follow-up in three
weeks. Dr. Llamas reexamined Elijah on 5/22/00 and discovered advanced ROP in
both eyes. . . . Drs. Ayo, Honkan, Caviglia, Perez-Benavides and Bernardo-Arellano
were neonatologists that covered the NICU during Elijah's relevant clinical course.

 Each neonatologist that provided care to Elijah Mendez from the time of the
initial follow-up [ophthalmologic] examination of May 1, 2000 until the second
follow-up examination on May 22, 2000 owed the same standard of care to Elijah. 
These neonatologists were negligent by not obtaining the needed ophthalmologic
examination within 1-2 weeks of the May 1, 2000 exam. This includes Drs. Luis
Ayo (May 2, 9, 10, 11, 16, 17), Jose Bernardo-Arellano (May 4, 5, 12, 13), Fortunato
Perez-Benavides (May 6, 7, 8), Roy Caviglia (May 14), and Vibha Honkan (May 1,
15), who cared for Elijah on these days. The infant was at very high risk for
developing ROP in this window of time in his life, and so he should have been
examined more frequently.


. . .



 To reiterate, his very low birthweight and gestational age at birth placed him
at particularly high risk for developing ROP. He should have been examined at least
every 2 weeks. Based on Dr. Ayo's own testimony concerning standard of care and
Dr. Llamas's May 1 exam demonstrating Elijah's incomplete vascularization, Drs.
Ayo, Honkan, Caviglia, Perez-Benavides and Bernardo-Arellano breached standard
of care by failing to provide a followup ROP exam for Elijah within 2 weeks of May
1.


 . . .



 If Drs. Ayo, Honkan, Caviglia, Perez-Benavides and Bernardo-Arellano
provided standard of care, a follow-up exam would have taken place between May
8 and May 15, when, within a reasonable degree of medical probability, Elijah would
have had the type of threshold ROP that should have been treated in a timely fashion
with ablative therapy. By providing appropriately-timed ablative therapy, Elijah's
bilateral legal blindness, within a reasonable degree of medical probability, would
never have occurred. Instead, Drs. Ayo, Honkan, Caviglia, Perez-Benavides and
Bernardo-Arellano failed to ensure a timely follow-up examination, resulting in
failure to diagnose Elijah's ROP at a point in time when he could have expected a
favorable outcome from surgery, to a medical probability. In my opinion Drs. Ayo,
Honkan, Caviglia, Perez-Benavides and Bernardo-Arellano's failure to provide this
standard of care is a proximate cause of Elijah's blindness.


. . .



 In addition, I agree with Dr. Sims' opinion stated in her report that Drs. Ayo,
Honkan, Caviglia, Perez-Benavides and Bernardo-Arellano's use of Dr. Llamas to
consult on and treat Elijah's ROP in this case when Dr. Radenovich,[ (6)] a trained
pediatric ophthalmologist, was available is beneath standard of care. Drs. Ayo,
Honkan, Caviglia, Perez-Benavides and Bernardo-Arellano's use of Dr. Llamas, who
improperly examined and treated Elijah's eyes, was also a proximate cause of
Elijah's blindness. Dr. Llamas was not appropriately trained and proctored to
perform laser surgery for ROP on neonates. Dr. Llamas's training to do laser surgery
for ROP consisted of attending a one day seminar and he then began doing laser
surgery for ROP on neonates without any proctoring by an ophthalmologist
experienced in performing laser surgery for ROP.


 . . .



 Elijah's legal blindness was proximately caused by Drs. Ayo, Honkan,
Caviglia, Perez-Benavides and Bernardo-Arellano['s] failures of standard of care, as
described above. Had they provided Elijah with a timely followup exam within 1-2
weeks of Dr. Llamas' May 1 exam, his threshold ROP would have been identified
and, to a reasonable degree of medical probability, ablative laser therapy would have
been effective in preventing his bilateral legal blindness.


APPLICATION


 Dr. Good, in his report, opined that Appellants breached the applicable standard of care in
two ways: (1) by failing to ensure that Mendez's eyes were examined for ROP by an
ophthalmologist within one to two weeks after Dr. Llamas examined them on May 1, 2000, and (2)
by allowing Dr. Llamas to provide the necessary care for Mendez's eyes when a trained pediatric
ophthalmologist was available to provide that care. Dr. Good further opined that, to "a reasonable
degree of medical probability," but for Appellants' breaches of the applicable standard of care,
Mendez's ROP would have been discovered and treated in a timely fashion and he would not have
suffered legal blindness. On this record, the trial court could have reasonably concluded that Dr.
Good's discussion of causation represented an objective good faith effort to meet the statutory
requirement. Dr. Good's report provided enough information to inform Appellants of the specific
conduct that Appellee had called into question and to allow the trial court to conclude that
Appellee's claim had merit. Thus, we discern no abuse of discretion on the part of the trial court in
its overruling of Appellants' objections to the adequacy of Dr. Good's expert report.

DR. SIMS' REPORT


 Appellants argue that the trial court erred in overruling their objections to the adequacy of
Dr. Sims' report because she was not qualified to opine on the issue of causation and, in any event,
she too failed "to provide a sufficiently specific description of the causal relationship between each
[of] Appellant's individual acts and Appellee's alleged injury." Dr. Sims' report read, in relevant
part, as follows:

 I currently hold a medical license in the State of California, where I am a
Professor of Pediatrics at the University of California, Los Angeles. I am a board-certified pediatrician and neonatologist. I have attached my curriculum vitae.[ (7)]

 During my career I have been Director of Newborn Services at Methodist
Hospital in Arcadia, CA, Director of [the] Newborn Intensive Care Unit at the King-Drew Medical Center, and, most recently, I was the Director of Newborn Services
at Olive View-UCLA Medical Center and held that position at the time these events
with Elijah occurred. I am active in establishing and updating policies and
procedures for neonatal care provided in the Newborn Intensive Care Unit and I have
been involved in the development of standard of care policies and procedures for the
care of premature babies for the past 20 years. I have chaired hospital committees
for quality improvement and Chaired the Department of Health Best Practice
Committee for Los Angeles County. In this capacity I have worked with and trained
neonatal nurses regarding appropriate nursing standards of care within the NICU.

 I have personally treated small preterm newborns like Elijah Mendez, and I
am familiar with the standards of care for treating such small infants, both at the
physician level and the hospital/nursing/staffing level with respect to policies and
procedures, for ensuring screening for retinopathy of prematurity (ROP). I have
requested ophthalmologic consultations from pediatric ophthalmologists to screen
preterm infants for ROP, and I have helped to develop the necessary policies and
procedures to ensure a baby at risk for ROP obtains the necessary care and treatment
he or she needs.


. . .



 Drs. Ayo, Honkan, Caviglia, Perez-Benavides and Bernardo-Arellano had an
individual responsibility as Elijah's neonatologists to ensure he was receiving proper
and timely ROP screenings, followup screenings, and that Elijah received the
necessary treatment for ROP. These neonatologists failed to ensure that a followup
screening took place between May 8 and May 15, or 1-2 weeks after Dr. Llamas'
May 1 exam.

 Furthermore, if Elijah had had a timely ophthalmologic screening
examination between May 8 and May 15, Elijah's ROP would have been timely and
appropriately treated with ablative therapy, and he would, within a reasonable degree
of medical probability, have an improved visual outcome.

 Finally, had Drs. Ayo, Honkan, Caviglia, Perez-Benavides and Bernardo-Arellano utilized Dr. Radenovich, a pediatric ophthalmologist with the necessary
education, training and experience to examine and treat babies at risk for ROP, Elijah
would have received the care and treatment he deserved - standard of care - and
Elijah would, within a reasonable degree of medical probability, [have] had an
improved visual outcome that would not have left him legally blind.

 In my opinion, the negligence of Drs. Ayo, Honkan, Caviglia, Perez-Benavides and Bernardo-Arellano, as described above, proximately caused Elijah's
bilateral legal blindness, and absent these failures Elijah would, within a reasonable
degree of medical certainty, [have] had an improved visual outcome."


APPLICATION Dr. Sims' report indicates that she is an accomplished neonatologist and that she is 

knowledgeable about procedures appropriate for ensuring that premature infants are screened for 

ROP. But nothing in Dr. Sims' report indicates that she has knowledge, skill, experience, training, 

or education in ophthalmology, pediatric ophthalmology, the way in which ROP 

presents in newborns, or how that disease is treated in general and in Mendez' case. On this 

record, then, the trial court could not have reasonably concluded that Dr. Sims had genuine 

expertise regarding the causal relationship between Appellants' alleged breach of the applicable 

standard of care and Mendez's injury. Thus, the trial court abused its discretion in overruling 

Appellants' objections to Dr. Sims' report. However, in light of Dr. Good's expert report, which 

the trial court properly upheld, the trial court did not err in not dismissing Appellee's health care 

claim.

SANCTIONS


 Appellee argues that we should award damages to her because it is "evident" that 

Appellants "have failed to identify any legitimate basis for concluding that the expert reports are 

insufficient . . . ." We have the authority, of course, to award just damages if we determine 

that an appeal is frivolous, but we exercise that authority only if the record shows that the 

appellant did not act in good faith and had no reasonable expectation of reversal. Faddoul v. 

Oaxaca, 52 S.W.3d 209, 213 (Tex. App. - El Paso 2001, no pet.); Tex. R. App. P. 45. In this case, 

Appellants have submitted a very thorough brief, counsel for Appellants appeared at oral 

argument, and Appellants have shown that the trial court did abuse its discretion in part. In view 

of all that, we cannot conclude that Appellants had no reasonable expectation of reversal.

CONCLUSION


 Although we have determined that the trial court erred by overruling the objections to the
expert report of Maureen Sims, M.D., the trial court properly overruled the objections to the expert
report of William Good, M.D. We therefore affirm the trial court's order denying the motion to
dismiss.

March 14, 2012 GUADALUPE RIVERA, Justice


Before Rivera, J., Antcliff, J., and Chew, C.J., (Senior)

Chew, C.J., (Senior), sitting by assignment, concurring



CONCURRING OPINION


 I respectfully concur. I do not believe that the trial court abused its discretion in refusing to
find Dr. Sims' expert report inadequate. See Pediatrix Medical Group v. Robinson, 352 S.W.3d 879
(Tex. App. - Dallas 2011, no pet.).


 DAVID WELLINGTON CHEW, Chief Justice (Senior)

March 14, 2012

1. From the record and the parties' briefs, we have pieced together what appear to be the undisputed facts. 
We have omitted certain facts not essential to our discussion.
2. ROP is "an ocular disorder of premature infants that occurs when the incompletely vascularized retina of
such an infant completes an abnormal pattern of vascularization and that is characterized by the presence of an
opaque fibrous membrane behind the lens of each eye." Merriam-Webster's Medical Desk Dictionary,
http://www.merriam-webster.com/ (March 13, 2012).
3. Legal blindness means "having not more than 20/200 visual acuity in the better eye with correcting lenses
or visual acuity greater than 20/200 but with a limitation in the field of vision such that the widest diameter of the
visual field subtends an angle no greater than 20 degrees." Tex. Hum. Res. Code Ann. § 91.002(2) (West 2001).
4. Dr. Ayo was a neonatologist who worked in the NICU during the time Mendez was a patient there. A
"neonatologist" is a physician who works in the "branch of medicine concerned with the care, development, and
diseases of newborn infants." Merriam-Webster's Collegiate Dictionary, http://www.merriam-webster.com/ (March
13, 2012).
5. A causal relationship exists between the defendant's failure to meet an applicable standard of care and the
plaintiff's injury if: (1) the defendant's failure was a substantial factor in causing the injury and (2) but for the
defendant's failure, the injury would not have occurred. Palafox v. Silvey, 247 S.W.3d 310, 317 (Tex. App. - El
Paso 2007, no pet.).
6. The record does not reflect Dr. Radenovich's given name.
7. The record contains no such additional curriculum vitae.