COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

ROY JOHN CAVIGLIA, M.D.,                 §
FORTUNATO PEREZ-BENAVIDES,                                    No. 08-10-00253-CV
M.D., AND JOSE BERNARDO                   §
ARELLANO, M.D.,                                          Appeal from the
                                          §
        Appellants,                                   County Court at Law No. 6
                                          §
v.                                                     of El Paso County, Texas
                                          §
TANIKA TATE, AS NEXT FRIEND OF                            (TC # 2009-4649)
ELIJAH MENDEZ,                            §

        Appellee.

# **O P I N I O N**

In this health care liability case, Appellants Dr. Roy John Caviglia, Dr. Fortunato Perez-Benavides, and Dr. Jose Bernardo Arellano filed written objections to the adequacy of Appellee Tanika Tate's expert reports, and asked that her claims be dismissed with prejudice because of that alleged inadequacy. The trial court, after hearing argument, issued orders overruling Appellants' objections. We affirm.

## **BACKGROUND**[1]

On February 29, 2000, Appellee, who was then in her twenty-fifth week of pregnancy, gave birth to a tiny baby boy, Elijah Mendez. Mendez weighed less than 1.5 pounds at birth and was immediately placed in the neonatal intensive care unit ("NICU") of Providence Memorial Hospital in El Paso, Texas. Because of his extreme prematurity, Mendez was at risk for an eye disease known

---

[1] From the record and the parties' briefs, we have pieced together what appear to be the undisputed facts. We have omitted certain facts not essential to our discussion.

as retinopathy of prematurity ("ROP").[2]

On April 3, 2000, Dr. Jorge Llamas-Soforo, an ophthalmologist in the Providence NICU, examined Mendez's eyes and found no indication of ROP. On May 1, 2000, Dr. Llamas-Soforo examined Mendez's eyes again and still found no indication of ROP. On May 22, 2000, however, Dr. Llamas-Soforo examined Mendez's eyes a third time and found ROP in both of them. On May 25, 2000, Dr. Llamas-Soforo performed laser surgery on Mendez's eyes, but the surgery did not save Mendez from permanent legal blindness.[3]

On October 19, 2009, Appellee, as next friend of Mendez, filed a lawsuit against Dr. Llamas-Soforo, Dr. Luis Ayo,[4] Providence Memorial Hospital, and others, alleging negligence that proximately caused Mendez's legal blindness. Appellee later amended her petition to add Dr. Vibha Honkan and Appellants as defendants. Dr. Honkan and Appellants were all neonatologists who worked in the Providence NICU during the time Mendez was a patient there.

Appellee timely served on Appellants two expert reports, one written by Dr. William Good, a pediatric ophthalmologist who practiced in California, and one written by Dr. Maureen Sims, a neonatologist who also practiced in California. Appellants timely filed written objections to the

---

[2] ROP is "an ocular disorder of premature infants that occurs when the incompletely vascularized retina of such an infant completes an abnormal pattern of vascularization and that is characterized by the presence of an opaque fibrous membrane behind the lens of each eye." *Merriam-Webster's Medical Desk Dictionary*, http://www.merriam-webster.com/ (March 13, 2012).

[3] Legal blindness means "having not more than 20/200 visual acuity in the better eye with correcting lenses or visual acuity greater than 20/200 but with a limitation in the field of vision such that the widest diameter of the visual field subtends an angle no greater than 20 degrees." TEX. HUM. RES. CODE ANN. § 91.002(2) (West 2001).

[4] Dr. Ayo was a neonatologist who worked in the NICU during the time Mendez was a patient there. A "neonatologist" is a physician who works in the "branch of medicine concerned with the care, development, and diseases of newborn infants." *Merriam-Webster's Collegiate Dictionary,* http://www.merriam-webster.com/ (March 13, 2012).

adequacy of the two expert reports and asked that Appellee's claims be dismissed with prejudice because of that alleged inadequacy. In their objections to Dr. Good's report, Appellants argued that he had "fail[ed] to show any causal link" between their alleged negligence and Mendez's blindness. In their objections to Dr. Sims' report, Appellants argued that she was "[n]ot qualified to opine as to [c]ausation" and that, in any event, she too had "failed to explain [how their] alleged negligence proximately caused Elijah's blindness."

The trial court later held a hearing on Appellants' objections. At that hearing, Appellants argued as follows:

> This case involves ROP, which is an eye disease of very premature babies. Only a handful of ophthalmologists treat ROP. Neonatologists do not treat it. They can treat the baby that has ROP; but as far as ROP itself goes . . . not even all ophthalmologists treat it. It is a very complex disease.
> And so Dr. Sims, who is a neonatologist, attempts in her report to opine as to causation in this case. And we first object to her qualifications to be able to opine to that because she has no experience, background, [or] training in treating ROP and saying how any breaches of the neonatologist actually caused any blindness through the ROP.
> Additionally, we also object to the actual opinions themselves as being conclusory. Essentially what Dr. Sims says is that the babies allegedly weren't screened timely and now the baby is blind. There is no testimony as to how that ROP – or how that delay caused any blindness. That doesn't . . . inform any of these defendants as to how their alleged breaches caused any of this plaintiff's injuries.
> With respect to Dr. Good's report, we object to his opinions regarding causation as also being conclusory. His opinions are essentially the same as Dr. Sims', and basically it doesn't inform the defendants as to how any of their alleged breaches caused any of the plaintiff's injuries.

3

Appellee responded to Appellants' arguments as follows:

[W]hat the report is supposed to do is demonstrate to the Court that the case has some merit. You've got some experts out there who are willing to go and make a report and show that there's some merit to the claim and also put the defendants on notice of the conduct that's being called into question. In doing that under Chapter 74 [of the Texas Civil Practice and Remedies Code], you're supposed to produce a report that talks about the standard of care, breaches of the standard of care and causation for each of the defendants.

. . .

In their objections . . . the defendants acknowledge that the neonatologist Dr. Sims is qualified to opine about the standard of care for neonatologists and the breaches; and they've also acknowledged that Dr. Good, a recognized expert in ophthalmology, is qualified to opine about causation. When you put the two reports together, you have standard of care and breach and causation which meets the Chapter 74 requirements.

At the conclusion of the hearing, the trial court overruled Appellants' objections to the two expert reports. Appellants later filed timely notices of interlocutory appeal. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(9) (West 2008).

## DISCUSSION

On appeal to this Court, Appellants bring two issues, in which they argue that the trial court erred in overruling their objections to the two reports. With respect to the adequacy of those reports, Appellants and Appellee make essentially the same arguments that they made below. In addition, however, Appellee asks that we award her damages because Appellants' appeal is frivolous. *See* TEX. R. APP. P. 45.

## STANDARD OF REVIEW

We review a trial court's Section 74.351 ruling for an abuse of discretion. *American Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 877 (Tex. 2001). A trial court abuses its discretion if it acts in an unreasonable or arbitrary manner, without reference to any

4

guiding rules or principles. *Walker v. Gutierrez*, 111 S.W.3d 56, 62 (Tex. 2003). A trial court acts arbitrarily and unreasonably if it could have reached only one decision, but instead reached a different one. *See Teixeira v. Hall*, 107 S.W.3d 805, 807 (Tex. App. – Texarkana 2003, no pet.). To that end, a trial court abuses its discretion when it fails to analyze or apply the law correctly. *In re Sw. Bell Tel. Co.*, 226 S.W.3d 400, 403 (Tex. 2007), *citing In re Kuntz*, 124 S.W.3d 179, 181 (Tex. 2003).

**RELEVANT LAW**

The plaintiff, in a health care liability lawsuit, must serve on each defendant one or more expert reports, and associated curricula vitae, no later than 120 days after the petition is filed. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a) (West 2011). For these purposes, an "expert report" is a written report by an expert that provides a fair summary of the expert's opinions regarding applicable standards of care, the manner in which the defendant failed to meet those standards, and the causal relationship between the defendant's failure and the plaintiff's injury. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6) (West 2011). A plaintiff may satisfy any requirement for serving an expert report by serving separate reports from different experts. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(i) (West 2011). Thus, a deficiency in one report may be made up in another report.

An expert report and/or its accompanying curriculum vitae must establish that the report's author is qualified to opine as an expert on the subject matter of the report. *In re McAllen Med. Center*, 275 S.W.3d 458, 463 (Tex. 2008). The medical expert need not practice in the same specialty as the defendant in order to qualify as an expert. *Roberts v. Williamson*, 111 S.W.3d 113, 122 (Tex. 2003). However, not every licensed physician is always qualified to testify on every medical question. *Broders v. Heise*, 924 S.W.2d 148, 152 (Tex. 1996). To be qualified to

5

opine on the causal relationship[5] between the defendant's alleged failure to meet an applicable standard of care and the plaintiff's injury, the report's author must be a physician who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(5) (West 2011).

Under Texas Rule of Evidence 702, an expert witness may be qualified on the basis of "knowledge, skill, experience, training, or education . . . ." The question of whether an expert witness is qualified under Rule 702 lies within the sound discretion of the trial court. *Broders v. Heise*, 924 S.W.2d 148, 151 (Tex. 1996). Thus, a medical expert from one specialty may be qualified to testify if he has practical knowledge of what is traditionally done by medical experts of a different specialty under circumstances similar to those at issue in the case. *Keo v. Vu*, 76 S.W.3d 725, 732 (Tex. App. – Houston [1st Dist.] 2002, pet. denied). Certainly, if the subject matter is common to and equally recognized and developed in all fields of practice, any practitioner familiar with the subject may testify as to the standard of care. *Id.*; *Blan*, 7 S.W.3d at 745. However, the proffered medical expert's qualifications must be evident from the four corners of his expert report and curriculum vitae. *See generally Palacios*, 46 S.W.3d at 878; *Christus Health Southeast Texas v. Broussard*, 267 S.W.3d 531, 536 (Tex. App. – Beaumont 2008, no pet.). The trial court must ensure that a witness who purports to be an expert really does have expertise regarding the subject about which he is offering an opinion. *Palafox v. Silvey*, 247 S.W.3d 310, 316 (Tex. App. – El Paso 2007, no pet.).

---

[5] A causal relationship exists between the defendant's failure to meet an applicable standard of care and the plaintiff's injury if: (1) the defendant's failure was a substantial factor in causing the injury and (2) but for the defendant's failure, the injury would not have occurred. *Palafox v. Silvey*, 247 S.W.3d 310, 317 (Tex. App. – El Paso 2007, no pet.).

A defendant may file written objections to the adequacy of an expert report. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(l) (West 2011). The trial court may sustain such objections only if it finds, after a hearing, that the report does not represent an objective good faith effort to comply with the statutory definition of an expert report (see above). *Id.* To represent an objective good faith effort, the report must provide enough information to: (1) inform the defendant of the specific conduct that the plaintiff has called into question and (2) allow the trial court to conclude that the claim has merit. *Palacios*, 46 S.W.3d at 879. A report that merely states the expert's conclusions about the standard of care, breach, and causation does not provide the necessary information. *Id*. On the other hand, a report does not have to meet the same requirements as the evidence offered in a summary judgment proceeding or at trial. *Id*.

A trial court's order denying a motion challenging the adequacy of an expert report is reviewed on appeal for abuse of discretion. *Id*. at 877.

## DR. GOOD'S REPORT

Appellants argue that the trial court erred in overruling their objections to the adequacy of Dr. Good's expert report because he failed "to provide a sufficiently specific description of the causal relationship between each Appellant's individual acts and Appellee's alleged injury." Appellants do not challenge Dr. Good's qualifications or the adequacy of his discussion of the applicable standard of care or the manner in which Appellants breached that standard; they complain only about Dr. Good's discussion of causation.

Dr. Good's report read, in relevant part, as follows:

Baby Elijah was born on 2/29/00 at an estimated gestational age of 24 weeks 5 days, with a birth weight of 650 grams. Baby Elijah was first examined by Dr. Llamas on 4/3/00, or between approximately 4-5 weeks of life. Dr. Llamas found no fungus in

7

the posterior pole and noted incomplete vascularization at 360 degrees. He recommended follow-up in 4 weeks. Throughout the next month, it was noted in the records that Elijah was at high risk for ROP and awaiting reassessment by Dr. Llamas. Dr. Llamas re-examined Elijah on 5/01/00. At that time Dr. Llamas noted Elijah's "increased vascularization, no ROP," and recommended follow-up in three weeks. Dr. Llamas reexamined Elijah on 5/22/00 and discovered advanced ROP in both eyes. . . . Drs. Ayo, Honkan, Caviglia, Perez-Benavides and Bernardo-Arellano were neonatologists that covered the NICU during Elijah's relevant clinical course.

Each neonatologist that provided care to Elijah Mendez from the time of the initial follow-up [ophthalmologic] examination of May 1, 2000 until the second follow-up examination on May 22, 2000 owed the same standard of care to Elijah. These neonatologists were negligent by not obtaining the needed ophthalmologic examination within 1-2 weeks of the May 1, 2000 exam. This includes Drs. Luis Ayo (May 2, 9, 10, 11, 16, 17), Jose Bernardo-Arellano (May 4, 5, 12, 13), Fortunato Perez-Benavides (May 6, 7, 8), Roy Caviglia (May 14), and Vibha Honkan (May 1, 15), who cared for Elijah on these days. The infant was at very high risk for developing ROP in this window of time in his life, and so he should have been examined more frequently.

.   .   .

To reiterate, his very low birthweight and gestational age at birth placed him at particularly high risk for developing ROP. He should have been examined at least every 2 weeks. Based on Dr. Ayo's own testimony concerning standard of care and Dr. Llamas's May 1 exam demonstrating Elijah's incomplete vascularization, Drs. Ayo, Honkan, Caviglia, Perez-Benavides and Bernardo-Arellano breached standard of care by failing to provide a followup ROP exam for Elijah within 2 weeks of May 1.

.   .   .

If Drs. Ayo, Honkan, Caviglia, Perez-Benavides and Bernardo-Arellano provided standard of care, a follow-up exam would have taken place between May 8 and May 15, when, within a reasonable degree of medical probability, Elijah would have had the type of threshold ROP that should have been treated in a timely fashion with ablative therapy. By providing appropriately-timed ablative therapy, Elijah's bilateral legal blindness, within a reasonable degree of medical probability, would never have occurred. Instead, Drs. Ayo, Honkan, Caviglia, Perez-Benavides and Bernardo-Arellano failed to ensure a timely follow-up examination, resulting in failure to diagnose Elijah's ROP at a point in time when he could have expected a favorable outcome from surgery, to a medical probability. In my opinion Drs. Ayo, Honkan, Caviglia, Perez-Benavides and Bernardo-Arellano's failure to provide this standard of care is a proximate cause of Elijah's blindness.

. . .

In addition, I agree with Dr. Sims' opinion stated in her report that Drs. Ayo, Honkan, Caviglia, Perez-Benavides and Bernardo-Arellano's use of Dr. Llamas to consult on and treat Elijah's ROP in this case when Dr. Radenovich,[6] a trained pediatric ophthalmologist, was available is beneath standard of care. Drs. Ayo, Honkan, Caviglia, Perez-Benavides and Bernardo-Arellano's use of Dr. Llamas, who improperly examined and treated Elijah's eyes, was also a proximate cause of Elijah's blindness. Dr. Llamas was not appropriately trained and proctored to perform laser surgery for ROP on neonates. Dr. Llamas's training to do laser surgery for ROP consisted of attending a one day seminar and he then began doing laser surgery for ROP on neonates without any proctoring by an ophthalmologist experienced in performing laser surgery for ROP.

. . .

Elijah's legal blindness was proximately caused by Drs. Ayo, Honkan, Caviglia, Perez-Benavides and Bernardo-Arellano['s] failures of standard of care, as described above. Had they provided Elijah with a timely followup exam within 1-2 weeks of Dr. Llamas' May 1 exam, his threshold ROP would have been identified and, to a reasonable degree of medical probability, ablative laser therapy would have been effective in preventing his bilateral legal blindness.

## APPLICATION

Dr. Good, in his report, opined that Appellants breached the applicable standard of care in two ways: (1) by failing to ensure that Mendez's eyes were examined for ROP by an ophthalmologist within one to two weeks after Dr. Llamas examined them on May 1, 2000, and (2) by allowing Dr. Llamas to provide the necessary care for Mendez's eyes when a trained pediatric ophthalmologist was available to provide that care. Dr. Good further opined that, to "a reasonable degree of medical probability," but for Appellants' breaches of the applicable standard of care, Mendez's ROP would have been discovered and treated in a timely fashion and he would not have suffered legal blindness. On this record, the trial court could have reasonably concluded that Dr.

---

[6] The record does not reflect Dr. Radenovich's given name.

9

Good's discussion of causation represented an objective good faith effort to meet the statutory requirement. Dr. Good's report provided enough information to inform Appellants of the specific conduct that Appellee had called into question and to allow the trial court to conclude that Appellee's claim had merit. Thus, we discern no abuse of discretion on the part of the trial court in its overruling of Appellants' objections to the adequacy of Dr. Good's expert report.

## DR. SIMS' REPORT

Appellants argue that the trial court erred in overruling their objections to the adequacy of Dr. Sims' report because she was not qualified to opine on the issue of causation and, in any event, she too failed "to provide a sufficiently specific description of the causal relationship between each [of] Appellant's individual acts and Appellee's alleged injury." Dr. Sims' report read, in relevant part, as follows:

> I currently hold a medical license in the State of California, where I am a Professor of Pediatrics at the University of California, Los Angeles. I am a board-certified pediatrician and neonatologist. I have attached my curriculum vitae.[7]
> During my career I have been Director of Newborn Services at Methodist Hospital in Arcadia, CA, Director of [the] Newborn Intensive Care Unit at the King-Drew Medical Center, and, most recently, I was the Director of Newborn Services at Olive View-UCLA Medical Center and held that position at the time these events with Elijah occurred. I am active in establishing and updating policies and procedures for neonatal care provided in the Newborn Intensive Care Unit and I have been involved in the development of standard of care policies and procedures for the care of premature babies for the past 20 years. I have chaired hospital committees for quality improvement and Chaired the Department of Health Best Practice Committee for Los Angeles County. In this capacity I have worked with and trained neonatal nurses regarding appropriate nursing standards of care within the NICU.
> I have personally treated small preterm newborns like Elijah Mendez, and I am familiar with the standards of care for treating such small infants, both at the physician level and the hospital/nursing/staffing level with respect to policies and procedures, for ensuring screening for retinopathy of prematurity (ROP). I have requested ophthalmologic consultations from pediatric ophthalmologists to screen

---

[7] The record contains no such additional curriculum vitae.

10

preterm infants for ROP, and I have helped to develop the necessary policies and procedures to ensure a baby at risk for ROP obtains the necessary care and treatment he or she needs.

. . .

Drs. Ayo, Honkan, Caviglia, Perez-Benavides and Bernardo-Arellano had an individual responsibility as Elijah's neonatologists to ensure he was receiving proper and timely ROP screenings, followup screenings, and that Elijah received the necessary treatment for ROP. These neonatologists failed to ensure that a followup screening took place between May 8 and May 15, or 1-2 weeks after Dr. Llamas' May 1 exam.

Furthermore, if Elijah had had a timely ophthalmologic screening examination between May 8 and May 15, Elijah's ROP would have been timely and appropriately treated with ablative therapy, and he would, within a reasonable degree of medical probability, have an improved visual outcome.

Finally, had Drs. Ayo, Honkan, Caviglia, Perez-Benavides and Bernardo-Arellano utilized Dr. Radenovich, a pediatric ophthalmologist with the necessary education, training and experience to examine and treat babies at risk for ROP, Elijah would have received the care and treatment he deserved – standard of care – and Elijah would, within a reasonable degree of medical probability, [have] had an improved visual outcome that would not have left him legally blind.

In my opinion, the negligence of Drs. Ayo, Honkan, Caviglia, Perez-Benavides and Bernardo-Arellano, as described above, proximately caused Elijah's bilateral legal blindness, and absent these failures Elijah would, within a reasonable degree of medical certainty, [have] had an improved visual outcome."

## APPLICATION

Dr. Sims' report indicates that she is an accomplished neonatologist and that she is knowledgeable about procedures appropriate for ensuring that premature infants are screened for ROP. But nothing in Dr. Sims' report indicates that she has knowledge, skill, experience, training, or education in ophthalmology, pediatric ophthalmology, the way in which ROP presents in newborns, or how that disease is treated in general and in Mendez' case. On this record, then, the trial court could not have reasonably concluded that Dr. Sims had genuine expertise regarding the causal relationship between Appellants' alleged breach of the applicable

11

standard of care and Mendez's injury. Thus, the trial court abused its discretion in overruling Appellants' objections to Dr. Sims' report. However, in light of Dr. Good's expert report, which the trial court properly upheld, the trial court did not err in not dismissing Appellee's health care claim.

## SANCTIONS

Appellee argues that we should award damages to her because it is "evident" that Appellants "have failed to identify any legitimate basis for concluding that the expert reports are insufficient . . . ." We have the authority, of course, to award just damages if we determine that an appeal is frivolous, but we exercise that authority only if the record shows that the appellant did not act in good faith and had no reasonable expectation of reversal. *Faddoul v. Oaxaca*, 52 S.W.3d 209, 213 (Tex. App. – El Paso 2001, no pet.); TEX. R. APP. P. 45. In this case, Appellants have submitted a very thorough brief, counsel for Appellants appeared at oral argument, and Appellants have shown that the trial court did abuse its discretion in part. In view of all that, we cannot conclude that Appellants had no reasonable expectation of reversal.

## CONCLUSION

Although we have determined that the trial court erred by overruling the objections to the expert report of Maureen Sims, M.D., the trial court properly overruled the objections to the expert report of William Good, M.D. We therefore affirm the trial court's order denying the motion to dismiss.

March 14, 2012

GUADALUPE RIVERA, Justice

Before Rivera, J., Antcliff, J., and Chew, C.J., (Senior)
Chew, C.J., (Senior), sitting by assignment, concurring

## CONCURRING OPINION

I respectfully concur. I do not believe that the trial court abused its discretion in refusing to find Dr. Sims' expert report inadequate. *See Pediatrix Medical Group v. Robinson*, 352 S.W.3d 879 (Tex. App. – Dallas 2011, no pet.).

DAVID WELLINGTON CHEW, Chief Justice (Senior)

March 14, 2012