# NO. 12-15-00189-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *GARRISON NURSING HOME AND REHABILITATION CENTER AND GARRISON NURSING HOME, INC., APPELLANTS* | § | *APPEAL FROM THE 145TH* |
| *V.* | § | *JUDICIAL DISTRICT COURT* |
| *LEGATHA DEMINGS, APPELLEE* | § | *NACOGDOCHES COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

Garrison Nursing Home and Rehabilitation Center and Garrison Nursing Home, Inc. (collectively Garrison) appeal the order of the trial court denying their motion to dismiss Legatha Demings's suit against them. We affirm.

## BACKGROUND

Prior to the events precipitating this suit, Demings had a medical history of hypertension, atrial fibrillation, congestive heart failure, emphysema, and a previous transient ischemic attack (TIA).[1] On May 22, 2012, while at home, Demings fell out of the bed after suddenly developing slurred speech and weakness in her extremities. She was taken to a hospital in Carthage, Texas, and then subsequently transferred to Nacogdoches Medical Center. While in the hospital,

---

[1] This appeal concerns whether the expert's report satisfies the requirements of Chapter 74 of the Texas Civil Practice and Remedies Code. Because we are confined to the four corners of the report and defer to the trial court's determination of the facts alleged in the report, our discussion of the facts is based on those as alleged by the expert in his report. *See Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 144 (Tex. 2015); *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001).

Demings was diagnosed as having had a cerebrovascular accident (CVA) or stroke. On May 25, 2012, the hospital discharged Demings to Garrison, and her physician noted in the discharge summary that her stroke was of "ischemic origin, most likely caused by her atrial fibrillation." Consequently, Demings's treating physician prescribed Xarelto, a blood thinning medication, to prevent further strokes. According to the physician, Demings's condition improved prior to her discharge to Garrison, and she had improved speech and movement in her left side.

Two weeks later, while at Garrison, Demings became "confused, combative, and unable to communicate." On June 8, 2012, she was transported by emergency medical services to Nacogdoches Medical Center. A computerized tomography (CT) scan of her head revealed an ischemic infarction of her brain consistent with a stroke. One of Demings's consulting physicians, a neurologist, documented that she had suffered a "[c]erebrovascular accident extension with newly developed global aphasia, aphasia and left-sided flaccid paralysis." That same day, nursing staff at Garrison created a "medication error report." This report documented that from the time Demings returned to Garrison after her first hospital stay on May 25, 2012, until her transfer to Nacogdoches Medical Center on June 8, 2012, Garrison wholly failed to administer Xarelto to Demings as ordered by her physician.

In 2014, Demings filed suit against Garrison, alleging that Garrison failed to administer Xarelto to her as ordered, which resulted in her June 8, 2012 stroke. In an attempt to comply with the expert report requirements of Chapter 74 of the Texas Civil Practice and Remedies Code, Demings filed a report and curriculum vitae from Pauline Kaper, R.N. Garrison filed its objections to the report and a motion to dismiss Demings's suit. The trial court found that Nurse Kaper's report was deficient, but signed an order denying Garrison's motion to dismiss and granting Demings a thirty day extension to cure the deficiencies.

Demings filed another report, this time from Keith E. Miller, M.D. Dissatisfied with the report, Garrison filed its objections and a motion to dismiss challenging Dr. Miller's qualifications and his opinion on causation. The trial court overruled Garrison's objections and denied its motion to dismiss. This interlocutory appeal followed.[2]

---

[2] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(9) (West Supp. 2016).

<u>**EXPERT REPORT**</u>

In its first issue, Garrison contends that Dr. Miller failed to demonstrate his qualifications to opine on the relationship between Garrison's failure to provide Xarelto and Demings's June 8, 2012 stroke. In its second issue, Garrison argues that Dr. Miller's report is conclusory on causation. Because these issues are related, we address them together.

<u>**Standard of Review**</u>

A trial court's ruling on qualifications of a medical expert and the sufficiency of an expert's report under Chapter 74 is reviewed for an abuse of discretion. ***Van Ness v. ETMC First Physicians***, 461 S.W.3d 140, 142 (Tex. 2015); ***Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios***, 46 S.W.3d 873, 875 (Tex. 2001). A trial court abuses its discretion if it acts without reference to guiding rules or principles. ***Van Ness***, 461 S.W.3d at 142. However, in exercising its discretion, it is incumbent upon the trial court to review the report, sort out its content, resolve any inconsistencies, and decide whether the report demonstrated a good faith effort to show that the plaintiff's claims have merit. *See **id.*** at 144. When reviewing factual matters committed to the trial court's discretion, an appellate court may not substitute its judgment for that of the trial court. ***Id.***

<u>**Expert Report Requirement**</u>

Chapter 74 of the civil practice and remedies code governs health care liability claims. ***Brewster v. Columbia Med. Ctr. of McKinney Subsidiary, L.P.***, 269 S.W.3d 314, 316 n.3 (Tex. App.–Dallas 2008, no pet.). Any person who brings suit asserting a health care liability claim must provide an expert report for each physician or health care provider against whom a health care liability claim is asserted. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a) (West Supp. 2016). An "expert report" is defined as a written report that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards of care, and the causal relationship between that failure and the injury, harm, or damages claimed. ***Id.*** § 74.351(r)(6); ***Bowie Mem'l Hosp. v. Wright***, 79 S.W.3d 48, 51 (Tex. 2002) (per curiam).

A trial court shall grant a motion challenging the adequacy of the report only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of "expert report" in section 74.351(r)(6). TEX. CIV. PRAC. & REM.

3

CODE ANN. § 74.351(*l*); *see also* **Loaisiga v. Cerda**, 379 S.W.3d 248, 260 (Tex. 2012). To represent an objective good faith effort to comply with statutory requirements, the expert report must (1) inform the defendant of the specific conduct the plaintiff has called into question, and (2) provide a basis for the trial court to conclude that the claims have merit. **Loaisiga**, 379 S.W.3d at 260; **Palacios**, 46 S.W.3d at 879.

**Expert Qualifications**

The proponent of an expert report has the burden to show that the expert is qualified. **Broders v. Heise**, 924 S.W.2d 148, 151–52 (Tex. 1996). To qualify as an expert witness on the issue of whether a health care provider departed from the accepted standards of care, a witness must (1) practice health care in a field of practice that involves the same type of care or treatment as that delivered by the health care provider, if the health care provider is an individual, at the time the testimony is given, or was practicing that type of health care when the claim arose; (2) have knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and (3) qualify on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.402(b) (West 2011).

To determine whether a witness is qualified, we consider whether the witness is (1) certified by a state licensing agency or national professional certifying agency or has other substantial training or experience in the area of health care relevant to the claim and (2) actively practicing health care in rendering health care services relevant to the claim. *See* **id.** § 74.402(c). We also examine the witness's report and curriculum vitae in making this assessment. *See* **Caviglia v. Tate**, 365 S.W.3d 804, 810 (Tex. App.—El Paso 2012, no pet.). Not every licensed doctor is qualified to testify on every medical question, but we must be careful not to draw expert qualifications too narrowly. **Adeyemi v. Guerrero**, 329 S.W.3d 241, 247 (Tex. App.—Dallas 2010, no pet.). To determine whether an expert report is sufficient to demonstrate the qualifications of the expert to opine, the trial court should focus on the medical expert's "knowledge, skill, experience, training, or education" concerning the specific issue before the court that would qualify the expert to give an opinion on that particular subject. **Broders**, 924 S.W.2d at 153-54.

4

**Causation**

A causal relationship is established by proof that the negligent act or omission was a substantial factor in bringing about the harm, and that, absent this act or omission, the harm would not have occurred. *Costello v. Christus Santa Rosa Health Care Corp.*, 141 S.W.3d 245, 249 (Tex. App.—San Antonio 2004, no pet.). Causation is often established in medical malpractice cases through evidence of a "reasonable medical probability" or "reasonable probability" that the alleged injuries were caused by the negligence of one or more defendants. *Jelinek v. Casas*, 328 S.W.3d 526, 532–33 (Tex. 2010). In other words, the plaintiff must present evidence "that it is 'more likely than not' that the ultimate harm or condition resulted from such negligence." *Id.* (quoting *Kramer v. Lewisville Mem'l Hosp.*, 858 S.W.2d 397, 399–400 (Tex. 1993)). An expert may show causation by explaining a chain of events that begins with a defendant doctor's negligence and ends in injury to the plaintiff. *See McKellar v. Cervantes*, 367 S.W.3d 478, 485 (Tex. App.—Texarkana 2012, no pet.).

A report is deficient if it states only the expert's conclusions about the standard of care, breach of the standard of care, or causation. *See Ortiz v. Patterson*, 378 S.W.3d 667, 671 (Tex. App.—Dallas 2012, no pet.). An expert cannot simply opine that the breach caused the injury. *Van Ness*, 461 S.W.3d at 142; *Jelinek*, 328 S.W.3d at 539. Rather, the report must explain, to a reasonable degree, how and why the breach of the standard of care caused the injury based on the facts presented. *Van Ness*, 461 S.W.3d at 142; *Jelinek*, 328 S.W.3d at 539–40. The report must explain the basis of the expert's statements to link his conclusions to the facts. *Bowie Mem'l Hosp.*, 79 S.W.3d at 52; *see also Taylor v. Fossett*, 320 S.W.3d 570, 575 (Tex. App.—Dallas 2010, no pet.) (expert report must contain sufficiently specific information to demonstrate causation beyond conjecture).

In determining whether the expert report represents a good faith effort to comply with the statutory requirements, the court's inquiry is limited to the four corners of the report. *Christian Care Ctrs., Inc. v. Golenko*, 328 S.W.3d 637, 641 (Tex. App.—Dallas 2010, pet. denied) (citing *Palacios*, 46 S.W.3d at 878). "We may not 'fill gaps' in an expert report by drawing inferences or guessing what the expert likely meant or intended." *Hollingsworth v. Springs*, 353 S.W.3d 506, 513 (Tex. App.—Dallas 2011, no pet.). "We determine whether a causation opinion is sufficient by considering it in the context of the entire report." *Ortiz*, 378 S.W.3d at 671.

**Dr. Miller's Qualifications**

Garrison argues that Dr. Miller failed to demonstrate that he is qualified to provide opinions regarding the causal relationship between the alleged failure to administer Xarelto and Demings's stroke. Specifically, Garrison argues that Dr. Miller did not show that he has knowledge, training, or experience with Xarelto and its relationship to strokes.

Garrison relies on *Collini v. Pustejovsky* and *HEB Grocery Co. v. Galloway* as support for its argument. *See HEB Grocery Co. v. Galloway*, No. 09-13-00486-CV, 2014 WL 2152128, at *5-6 (Tex. App.—Beaumont May 22, 2014, no pet.) (mem. op.); *Collini v. Pustejovsky*, 280 S.W.3d 456, 465-66 (Tex. App.—Fort Worth 2009, no pet.). In *Collini*, the plaintiff alleged the defendant had negligently prescribed the drug Reglan, which caused her to suffer tardive dyskinesia. *Id.* at 460. In finding the plaintiff's Chapter 74 expert unqualified to opine on causation, the appellate court wrote that the expert does not indicate "he has any experience or training regarding Reglan or tardive dyskinesia at all; rather, [his report] only generally states that he has knowledge applicable to 'primary care and family medicine.'" *Id.* at 465-66.

In *Galloway*, the plaintiff contended that a pharmacist at HEB mistakenly mixed an antifungal medication with blood pressure medication causing her damages related to uncontrolled blood pressure. The plaintiff submitted an expert report of a doctor whose curriculum vitae described expertise primarily in the field of anesthesiology. *Galloway*, 2014 WL 2152128, at *1, 5. He stated that he writes prescriptions to patients, has training and experience in the same fields as health care providers like HEB and its pharmacists, and that physicians and patients rely on pharmacists to accurately fill prescriptions. *Id.* The court of appeals held that the physician's "overly broad and general references to writing prescriptions for patients and his statement regarding reliance upon pharmacists to accurately fill prescriptions would not demonstrate that he would be qualified to testify as to causation." *Id.* at *5. The court noted that the physician failed to state that he had treated patients with high blood pressure, prescribed blood pressure medication, was familiar with the side effects of the medication and the ensuing effects after patients fail to take their medication, or that he was familiar with the pharmacology of the blood pressure and antifungal medications. *See id.* at *6.

The reports in those cases are distinguishable from Dr. Miller's report. In his report, Dr. Miller stated that he currently practices in nursing homes similar to Garrison, he has had numerous patients similar to Demings, and he is board certified in family medicine and has

6

practiced in the field for twenty-five years. He stated that his opinions in the report are based on his education, training, and direct experience in the diagnosis, care, and treatment of patients with the same or similar conditions as Demings. He also stated that as part of his practice, he is involved in the diagnosis and treatment of patients with CVA's (strokes), hypertension, and related illnesses and their complications. Dr. Miller communicated that he acquired this knowledge from medical school courses, practical experience, study of technical works for treating these conditions, discussion with colleagues who treat these conditions, and his routine and regular contact with nursing home staff who take care of patients with the same conditions as Demings. Later in his report, Dr. Miller explained that Demings's stroke was of ischemic origin, most likely caused by her atrial fibrillation. Consequently, he continued, her treating physician prescribed Xarelto, which he explained was a blood thinning anticoagulant used to treat patients with atrial fibrillation in order to avoid future strokes. He also stated that Garrison's failure to provide Xarelto as ordered led to an increased risk for stroke in view of her diagnosis of atrial fibrillation. Finally, Dr. Miller explained that he is familiar with the formulation and execution of policies and procedures in administering medication in nursing homes under the circumstances of this case.

Based on this information in Dr. Miller's report, we cannot conclude that the trial court abused its discretion in determining that Dr. Miller demonstrated he was qualified to opine on Garrison's failure to provide Demings her Xarelto and its relationship to her resulting stroke.

**Dr. Miller's Causation Opinion**

Garrison argues further that Dr. Miller's opinion regarding causation is conclusory because he fails to provide any explanation linking the alleged failure to provide Xarelto to Demings and the stroke she allegedly suffered.

Garrison relies on *Jelinek v. Casas*, where the plaintiff claimed that a delay in providing antibiotics caused a prolonged hospital stay and an increase in pain and suffering. *Jelinek v. Casas*, 328 S.W.3d 526, 530 (Tex. 2010). The court held that the expert's report provided no more than a bare assertion that the defendant's alleged breach—failing to timely provide antibiotics—resulted in increased pain and suffering and a prolonged hospital stay. *See id.* at 539.

Dr. Miller's report provides more than a bare assertion that Garrison's failure to provide Xarelto was a proximate cause of Demings's June 8, 2012 stroke. Dr. Miller stated that

7

Demings's treating physician ordered that she be placed on Xarelto, which he explained was an anticoagulant blood thinning medication used to prevent strokes in patients with atrial fibrillation. Dr. Miller noted that Demings's treating physician at Nacogdoches Medical Center observed that she made improvement in her speech and displayed increased movement on her left side upon receiving Xarelto. Upon her transfer to Garrison on May 25, 2012, Garrison failed to provide Demings her Xarelto. On June 8, 2012, Demings was taken back to Nacogdoches Medical Center, where hospital staff determined that she suffered another stroke. According to Dr. Miller, that same day, nursing staff at Garrison made a "medication error report," documenting that no one at Garrison provided Demings her Xarelto. Dr. Miller stated that staff at Garrison noted in the error report that

> [Demings] arrived after 5:00 pm on a Friday. This medication (Xarelto) was ordered along (with) all other meds from nursing home pharmacy – nurse transcribing orders had to have all meds written on pharmacy order sheets and faxed in to pharmacy by 6 pm so they could be delivered that night.

Dr. Miller continued that the medication error report documented that

> a nurse at this nursing home "failed to transcribe this med (medication) to MAR (Medication Administration Record)[,]" . . . "an oversight." A question on this same form asked[,] "Could the error have endangered the life or welfare of the patient?" The responsible nurse completing the form answered the question with "[m]akes her a higher risk for stroke in view of her diag (diagnosis) of atrial fibrillation."

Dr. Miller also included notes from Demings's other treating physicians in a subsequent hospitalization documenting that Demings suffered from atrial fibrillation when she was first admitted into Garrison, and that "[s]he was started (on) Xarelto. Apparently . . . [staff at Garrison] did not follow-through in the nursing home, and she had . . . strokes. . . ." Dr. Miller further noted that this physician documented the importance of a patient such as Demings, who suffered with atrial fibrillation, remaining on a blood-thinning medication such as Xarelto for the remainder of her life.

Dr. Miller went on to state that staff at Garrison failed to appreciate that Demings was at the highest risk for the development of future strokes due to her past medical history of hypertension, atrial fibrillation, a previous TIA, and a previous stroke. Dr. Miller opined that the nursing staff at Garrison failed to properly transfer Demings's medication order for Xarelto to

her medication administration record. Dr. Miller explained that Demings arrived at Garrison late on a Friday. Consequently, he continued, Garrison's nursing staff had a short deadline to present her medication orders to the pharmacy, and she might not receive her medications until the following day, or perhaps longer, due to the fact that the following day fell on a weekend. Dr. Miller stated there was no procedure in place at Garrison to ensure that medication orders are accurately transcribed. He knew of the failure to maintain a proper system because the medication error report indicated Garrison's nursing staff recognized the need to improve their procedures for ordering medications from the pharmacy. Specifically, Dr. Miller stated that the error report included the question, "What precautions can you take to prevent a similar error?" The nurse completing the report answered, "Always have two nurses check orders on new admissions to make sure (orders are) transcribed correctly." Dr. Miller went on to conclude as follows:

> It is my opinion, based upon my experience, knowledge, qualifications and review of these records that these standards were not followed and the result was that Ms. Legatha Demings was harmed and injured. The failure to comply with these standards caused, within a reasonable degree of medical and nursing[] probability and certainty, Ms. Demings to suffer a stroke, extensive hospitalization, rehabilitation, and related complications, which compromised her overall health and well-being, and resulted in an overall worsening of her condition, unnecessary and preventable pain, suffering, mental anguish, and loss of dignity. These injuries and illnesses could have, within a reasonable degree of medical and nursing[] probability and certainty, been prevented or detected/addressed earlier if these standards had been followed.

Garrison contends that Dr. Miller did not sufficiently demonstrate the failure to provide Xarelto and its relationship to causing Demings's stroke. Demings was not required to present evidence in Dr. Miller's report as if she were actually litigating the merits. *See Palacios*, 46 S.W.3d at 879. It is true that Dr. Miller did not provide a detailed discussion of Xarelto's pharmacology. However, he did explain that Xarelto is an anticoagulant blood thinner used to treat patients with atrial fibrillation for the purpose of preventing strokes. He also noted that when provided Xarelto by her treating physician at Nacogdoches Medical Center, Demings experienced improvement in her condition. Dr. Miller explained that Garrison's own staff acknowledged its failure to provide Demings's Xarelto in the medication error report, including that its failure made her a higher risk for having a stroke in light of her medical history. Dr. Miller opined that Garrison breached the standard of care in failing to recognize this risk and ensure that a patient in Demings's circumstances received her medication. He then directly

9

concluded that this failure, in terms of a reasonable medical probability, caused Demings to suffer a stroke and the ensuing complications.

Under the circumstances present in this case, Dr. Miller provided sufficient information in his report to allow the trial court to conclude that he adequately addressed causation to a reasonable degree and that the report satisfies the requirements and purposes of Chapter 74. Accordingly, we hold that the trial did not abuse its discretion in overruling Garrison's objections to Dr. Miller's report and its motion to dismiss.[3]

Garrison's first and second issues are overruled.

## DISPOSITION

Having overruled Garrison's two issues, we *affirm* the order of the trial court overruling its objections to Dr. Miller's report and its motion to dismiss.

**BRIAN HOYLE**
Justice

Opinion delivered September 21, 2016.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(PUBLISH)

---

[3] In its brief, Garrison counters Demings's argument that Garrison's conduct falls within the res ipsa loquitur doctrine. Garrison also contends that we may not review Nurse Kaper's report in conjunction with Dr. Miller's report. Since we have held that the trial court did not abuse its discretion when it concluded that Dr. Miller's report is sufficient under Chapter 74, we need not address these issues. *See* TEX. R. APP. P. 47.1.



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**SEPTEMBER 21, 2016**

**NO. 12-15-00189-CV**

**GARRISON NURSING HOME AND REHABILITATION CENTER
AND GARRISON NURSING HOME, INC.,**
Appellants
V.
**LEGATHA DEMINGS,**
Appellee

Appeal from the 145th District Court

of Nacogdoches County, Texas (Tr.Ct.No. C1430319)

THIS CAUSE came to be heard on the oral arguments, appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the trial court's order.

It is therefore ORDERED, ADJUDGED and DECREED that the order overruling its objections to Dr. Keith E. Miller's report and its motion to dismiss of the court below **be in all things affirmed**, and that all costs of this appeal are hereby adjudged against the Appellants, **GARRISON NURSING HOME AND REHABILITATION CENTER AND GARRISON NURSING HOME, INC.,** for which execution may issue, and that this decision be certified to the court below for observance.

Brian Hoyle, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*