# NO. 12-17-00297-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *OCEANS BEHAVIORAL HEALTHCARE OF LONGVIEW, AUDUBON BEHAVIORAL HOSPITAL OF LONGVIEW, LLC D/B/A OCEANS BEHAVIORAL HOSPITAL OF LONGVIEW AND OCEANS ACQUISITION, INC. AND JAVEN V. CAVAZOS, M.D., APPELLANTS* | § § | *APPEAL FROM THE* |
| *V.* | | *COUNTY COURT AT LAW NO. 2* |
| *NANCY M. BUTLER, INDIVIDUALLY AND AS EXECUTOR OF THE ESTATE OF HUEY D. BUTLER, DECEASED, AND ON BEHALF OF THE WRONGFUL DEATH BENEFICIARIES OF HUEY D. BUTLER, APPELLEE* | § § | *GREGG COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

Javen V. Cavazos, MD (Dr. Cavazos) and Oceans Behavioral Hospital of Longview, Audubon Behavioral Healthcare of Longview, LLC d/b/a Oceans Behavioral Hospital of Longview and Oceans Acquisition, Inc. (Oceans) appeal the court's order denying their motions to dismiss Nancy M. Butler's (Mrs. Butler) suit against them. We affirm.

## BACKGROUND

On March 10, 2015, Huey Butler (Mr. Butler) admitted himself to Oceans at the request of Dr. Cavazos for the adjustment of Mr. Butler's psychotropic medications. At the time of his admission to Oceans, Mr. Butler suffered from dementia and major depressive disorder, but was

physically healthy and ambulatory. He remained a patient at Oceans for approximately two weeks under the care of Dr. Cavazos.

On March 23, Oceans staff found Mr. Butler unresponsive and he was transported to Longview Regional Hospital by ambulance. Upon arrival at the hospital, Mr. Butler was diagnosed with brain and kidney damage due to severe dehydration and pneumonia. His body was contracted and he was unable to lie prone on a hospital bed. Mr. Butler was discharged from the hospital to a long term care facility where he died five months later.

Mr. Butler's widow, Mrs. Butler, brought a healthcare liability claim against both Oceans and Dr. Cavazos. In an attempt to comply with Section 74.351 of the Texas Civil Practice and Remedies Code, Mrs. Butler served an expert report and curriculum vitae by Dr. Keith Miller on both Oceans and Dr. Cavazos. Oceans and Dr. Cavazos filed objections to Dr. Miller's report and motions to dismiss Mrs. Butler's claim. The trial court denied their motions and this appeal followed.

## EXPERT REPORT

In their first issue, Oceans and Dr. Cavazos argue that Dr. Miller failed to demonstrate his qualifications to opine on the standard of care at issue in this case. In issue two, they argue that Dr. Miller's report failed to set forth the specific standards of care, identify specific breaches of those standards, and identify the causal relationship between the alleged breaches and Mr. Butler's injuries. Because these issues are related, we will address them together.[1]

### Standard of Review

A trial court's ruling on qualifications of a medical expert and the sufficiency of an expert's report under Chapter 74 is reviewed for an abuse of discretion. *Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 142 (Tex. 2015); *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 875 (Tex. 2001). A trial court abuses its discretion if it acts without reference to guiding rules or principles. *Van Ness*, 461 S.W.3d at 142. However, in exercising its discretion, it is incumbent upon the trial court to review the report, sort out its content, resolve

---

[1] Mrs. Butler argues that Appellants' only objection at the trial court level was to her fourth theory of liability, which is that Appellants improperly administered antipsychotic medications to Mr. Butler. Thus, Mrs. Butler argues that Appellants waived all complaints regarding her first three theories of liability, which are that Appellants (1) failed to ensure Mr. Butler remained well hydrated, (2) failed to ensure Mr. Butler was not over-sedated, and (3) improperly physically and chemically restrained Mr. Butler. A review of the record indicates that Appellants' objections and arguments to the trial court sufficiently comport with the arguments they make on appeal, and we conclude that Mrs. Butler's waiver argument is without merit. *See* TEX. R. APP. P. 33.1(a)(1)(A).

2

any inconsistencies, and decide whether the report demonstrated a good faith effort to show that the plaintiff's claims have merit. *See id.* at 144. When reviewing factual matters committed to the trial court's discretion, an appellate court may not substitute its judgment for that of the trial court. *Gray v. CHCA Bayshore L.P.*, 189 S.W.3d 855, 858 (Tex. App.—Houston [1st Dist.] 2006, no pet.).

## Expert Report Requirements

The Texas Medical Liability Act requires a claimant to serve an expert report early in the proceedings on each party against whom a health care liability claim is asserted. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a) (West 2017). The Texas Supreme Court has explained that "eliciting an expert's opinions early in the litigation [is] an obvious place to start in attempting to reduce frivolous lawsuits." *Palacios*, 46 S.W.3d at 877. The purpose of evaluating expert reports is to deter frivolous claims, not to dispose of claims regardless of their merits. *See Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 631 (Tex. 2013). A valid expert report must fairly summarize the applicable standard of care; explain how a physician or health care provider failed to meet that standard; and establish a causal relationship between the failure and the harm alleged. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6) (West 2017); *Potts*, 392 S.W.3d at 630.

A report need not cover every alleged liability theory to make the defendant aware of the conduct at issue, nor does it require litigation ready evidence. *Potts*, 392 S.W.3d at 631-32. The report can be informal in that the information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial. *Id.* For the particular liability theory addressed, the report must sufficiently describe the defendant's alleged conduct. *Id.* Such a report both informs a defendant of the behavior in question and allows the trial court to determine if the allegations have merit. *Id.* If the trial court decides that a liability theory is supported, then the claim is not frivolous, and the suit may proceed. *Id.* If a health care liability claim contains at least one viable liability theory, as evidenced by an expert report meeting the statutory requirements, the claim cannot be frivolous. *Id.*

## Expert Qualifications

The proponent of an expert report has the burden to show that the expert is qualified. *Broders v. Heise*, 924 S.W.2d 148, 152-53 (Tex. 1996). To qualify as an expert witness on the issue of whether a *physician* departed from the accepted standards of care, a witness must (1)

3

practice medicine at the time such testimony is given or was practicing medicine at the time the claim arose; (2) have knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and (3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.401(a) (West 2017) (emphasis added). To determine whether a witness is qualified on the basis of training and experience to opine regarding departures from the standard of care for physicians, we consider whether the witness is (1) board certified or has other substantial training or experience in an area of medical practice relevant to the claim; and (2) is actively practicing medicine in rendering medical care services relevant to the claim. *See id.* § 74.401(c) (West 2017). To qualify as an expert witness on the issue of whether a *health care provider* departed from the accepted standards of care, a witness must (1) practice health care in a field of practice that involves the same type of care or treatment as that delivered by the health care provider, if the health care provider is an individual, at the time the testimony is given, or was practicing that type of health care when the claim arose; (2) have knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and (3) qualify on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care. *See id.* § 74.402(b) (West 2017) (emphasis added). To determine whether a witness is qualified on the basis of training and experience to opine regarding departures of the standard of care for a health care provider, we consider whether the witness is (1) certified by a state licensing agency or national professional certifying agency or has other substantial training or experience in the area of health care relevant to the claim and (2) actively practicing health care in rendering health care services relevant to the claim. *See id.* § 74.402(c) (West 2017).

We also examine the witness's report and curriculum vitae in determining whether a witness is qualified as an expert. *See* ***Caviglia v. Tate***, 365 S.W.3d 804, 810 (Tex. App.—El Paso 2012, no pet.). Not every licensed doctor is qualified to testify on every medical question, but we must be careful not to draw expert qualifications too narrowly. ***Adeyemi v. Guerrero***, 329 S.W.3d 241, 247 (Tex. App.—Dallas 2010, no pet.). To determine whether an expert report is sufficient to demonstrate the qualifications of the expert to opine, the trial court should focus on the medical expert's "knowledge, skill, experience, training, or education" concerning the

4

specific issue before the court that would qualify the expert to give an opinion on that particular subject. *Broders*, 924 S.W.2d at 153.

**Dr. Miller's Qualifications**

Dr. Cavazos and Oceans both argue that Dr. Miller is not qualified to opine on the standards of care applicable in this case because Dr. Miller (1) is not a psychiatrist, and (2) has not demonstrated knowledge for the accepted standard of care for psychiatric or behavioral hospitals treating patients that suffer from major depressive disorder with psychotic disturbances and dementia with behavioral disturbances.

Dr. Cavazos specifically argues that Dr. Miller "does not have the knowledge of the accepted standards of medical care for the treatment involved in the claim…Dr. Miller is not qualified to opine as to the accepted standards of care for psychiatrists at behavioral hospitals who treat patients that suffer from major depressive disorder with psychotic disturbances and dementia with behavioral disturbances." She argues that Dr. Miller's report and curriculum vitae do not sufficiently articulate how Dr. Miller has knowledge of the standards of care relevant to this claim. Dr. Cavazos further argues that Dr. Miller is not a psychiatrist and that Dr. Miller "has failed to establish within the four corners of his report that he has knowledge of the accepted standard of care for Decedent's complex psychiatric conditions." She also argues that Dr. Miller cannot be qualified based on his training and experience, because he is not board certified in psychiatry, does not have significant training or experience in the field of psychiatry, and was not practicing in the field of psychiatry at the time the claim arose.

Oceans similarly argues that Dr. Miller is not qualified because he failed to demonstrate that he is "familiar with[,] the accepted standard of care for behavioral or psychiatric hospitals…also there is nothing in his report or curriculum vitae demonstrating that he…is familiar with the treatment of psychiatric patients in a behavioral or psychiatric hospital or that he has experience treating such patients in a behavioral or psychiatric hospital." Oceans further argues that Dr. Miller does not practice health care that involves the same type of treatment or care as delivered by Oceans and its personnel.

Dr. Miller's report and curriculum vitae indicate that he is a practicing physician and is board certified in family medicine. Dr. Miller states that he has over twenty five years' experience practicing medicine in office settings, hospitals, nursing homes, rehabilitation centers, emergency departments, and other healthcare facilities. His curriculum vitae indicates that he

currently has physician privileges at various hospitals, nursing homes, and assisted living facilities, and is the medical director for several home health agencies and hospice facilities. Dr. Miller reports familiarity with the diagnosis and treatment of patients with depression, dementia, related illnesses, and their complications and familiarity with the standard of care applicable to physicians, nurses, healthcare facilities, and their staff that treat patients such as Mr. Butler. Dr. Miller reports having training similar to the training of the healthcare providers, nurses, and staff in this case. He further indicates that he is qualified because he has treated many patients with depression, dementia, and related illnesses and their complications.

According to Dr. Miller, from the time of the medical treatment of Mr. Butler during March 2015, he had an active clinical practice as a family practitioner that includes providing care to adult patients, such as Mr. Butler, in healthcare facilities. Dr. Miller notes that during his career he worked with and supervised medical office staff, hospital staff, nursing home staff, and rehabilitation center staff, including medical technologists and nurses, in the care of his patients. He further states that he participated in the development and use of protocols, policies, and procedures for the care of patients, like Mr. Butler, with depression, dementia, related illnesses, and their causes and complications. Dr. Miller states that he acquired his education, knowledge, training, and experience through (1) attending and successfully completing medical school and residency, which teaches the evaluation, diagnosis, care, and treatment of patients with depression, dementia, and their complications; (2) the practical experience of diagnosing and treating patients with depression, dementia, and their complications; (3) discussions with colleagues at yearly conferences, seminars, and meetings; (4) the study of technical works routinely published in textbooks, journals, and literature concerning the evaluation, diagnosis, care, and treatment of patients with depression, dementia, and their complications; (5) routine discussions and consultations with other physicians who also treat patients with depression, dementia, and their complications; (6) routine and regular contact with nursing home nurses, staff, and residents who care for patients with depression, dementia, and their complications; (7) knowledge and experience giving lectures and in-service conferences to nurses and staff; (8) experience serving on numerous hospital and nursing home committees; and (9) observing nurses and their conduct, supervising residents, and instructing nurses and residents in the evaluation, diagnosis, care, and treatment of patients similar to Mr. Butler, who suffer from depression, dementia, and their complications.

While Dr. Miller's report and curriculum vitae indicate he is a family medicine doctor and it is undisputed that Dr. Cavazos is a psychiatrist, "there are certain standards of medical care that apply to multiple schools of practice and any medical doctor." *Moore v. Gatica*, 269 S.W.3d 134, 141 (Tex. App.—Fort Worth 2008, pet. denied) (quoting *Blan v. Ali*, 7 S.W.3d 741, 746 (Tex. App.—Houston [14th Dist.] 1999, no pet.)). Thus, a physician who is not of the same school of medicine as the defendant is competent to testify if he has practical knowledge of what is usually and customarily done by a practitioner under circumstances similar to those confronting the defendant. *Moore*, 269 S.W.3d at 141.

The factual allegations as set forth in Mrs. Butler's petition state that Mr. Butler was an otherwise healthy, ambulatory seventy-four year old male who checked himself into Oceans at the request of Dr. Cavazos for adjustment of his psychotropic medications related to his major depression and dementia. The petition alleges that Mr. Butler was physically and chemically restrained upon admission and was sedated daily to the point he could not ambulate, eat, or drink, required total assistance with daily activities, and remained in this state until he was found unresponsive on March 23, 2015. Mr. Butler was then transported to the hospital where he was diagnosed with brain and kidney damage resulting from severe dehydration and pneumonia. The petition further alleges that Oceans was chronically understaffed.

Dr. Miller's report delineates four standards of care for each Dr. Cavazos and Oceans. One standard discussed by Dr. Miller is that Oceans and Dr. Cavazos should have taken any necessary measures to ensure that Mr. Butler remained well hydrated at all times. We conclude that maintaining hydration is one of those "certain standards of medical care that apply to multiple schools of practice and any medical doctor." *Id.*; *Blan*, 7 S.W.3d at 746. Dr. Miller's report and curriculum vitae indicate he is a board certified family physician, practicing medicine in a field of practice that involves the same type of care or treatment as that provided by Appellants at the time of the claim and that he has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 74.401(a)(1)(2), 74.402(b)(1)(2). As outlined above, Dr. Miller articulated significant experience treating patients with dementia and depression in an in-patient care setting.[2]

---

[2] In their reply brief and at oral argument, Appellants' cited *Christus Spohn Health System Corp v. Castro* to support their position that because Dr. Miller is not a psychiatrist and has not treated patients in a psychiatric

Accordingly, we are not persuaded by Appellants' argument that Dr. Miller is not qualified to opine on the standard of care simply because he is not a psychiatrist or has not practiced in a facility designated as a psychiatric or behavioral hospital. We reach this conclusion because the appropriate inquiry in determining whether a doctor is qualified to testify is not his or her area of practice, but his or her familiarity with the issues involved in the claim before the court. *See* ***Menefee v. Ohman***, 323 S.W.3d 509, 514 (Tex. App.—Fort Worth 2010, no pet.). Dr. Miller's report and curriculum vitae show he is qualified to opine on the methods for ensuring that patients suffering from dementia and depression remain hydrated in an in-patient care setting. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 74.401(a), 74.402(b); *see also* ***Potts***, 392 S.W.3d at 631-32; ***Moore***, 269 S.W.3d at 141; ***Blan***, 7 S.W.3d at 746.

As previously stated, if a health care liability claim contains at least one viable liability theory, as evidenced by an expert report meeting the statutory requirements, the claim cannot be frivolous. ***Potts***, 392 S.W.3d at 631-32. Thus, because Dr. Miller is qualified to opine on at least one theory of liability, we overrule Appellants' first issue. *See **id.***

### Articulation of Standard of Care

In addition to arguing that Dr. Miller is not qualified, Appellants contend that his report failed to adequately set forth the applicable standard of care applicable to each Appellant. Dr. Cavazos argues that Dr. Miller's opinions regarding the accepted standards of care for Mrs. Butler's claims are conclusory and lack specificity. Appellants argue that Dr. Miller did not sufficiently articulate the steps an ordinary and prudent physician would take under the same or similar circumstances.

An expert's report is sufficient if it provides a "fair summary" of the expert's opinions about the applicable standards of care, how the physician failed to meet those standards, and how

---

hospital setting, he is not qualified to testify regarding the standard of care in this case. We conclude that ***Castro*** is distinguishable from the facts in this case. In ***Castro***, the court of appeals held that a physician board certified in internal medicine and geriatrics was not qualified to opine on the development of pressure ulcers in the context of an intensive care/trauma unit (ICU). No. 13-13-00302-CV, 2013 WL 6576041 *4 (Tex. App—Corpus Christi, Dec. 12, 2013, no pet.) (mem. op.). The plaintiff was involved in a serious car accident and sustained fracture and dislocation of his cervical spine, multiple rib fractures, a collapsed lung, and damage to his right phrenic nerve. ***Id.*** at *1. Further, he had no sensation or movement below his chest, putting him at a high risk for skin breakdown. ***Id.*** Subsequently, while still in the ICU, he developed a pressure ulcer. ***Id.*** In holding the plaintiff's expert unqualified, the court noted that his expert had no ICU or trauma care experience. ***Id.*** at *5. We are not persuaded the reasoning in ***Castro*** supports Appellant's position that there is something inherently different about psychiatry or a facility being a psychiatric or behavioral hospital in terms of maintaining hydration among patients. In ***Castro***, the court clearly considered the extreme nature of the plaintiff's injuries and the fact that an ICU unit serves only, by definition, severely injured patients. *See **id.*** at *5.

that failure caused the injury, harm, or damages claimed. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6). An adequate expert report "must inform the defendant of the specific conduct the plaintiff has called into question," and it "must provide a basis for the trial court to conclude that the claims have merit." *Palacios*, 46 S.W.3d at 879 (Tex. 2001); *accord* **Baty v. Futrell**, No. 16-0164, 2018 WL 665456, at \*4 (Tex. Feb. 2, 2018) (not yet released for publication). The report must provide sufficient information to demonstrate "what care was expected, but not given." *Palacios*, 46 S.W.3d at 880. In considering a challenge to the sufficiency of an expert report, we must "view the report in its entirety, rather than isolating specific portions or sections." *Baty*, 2018 WL 665456, at \*4.

Dr. Miller's report begins by summarizing his background and expertise. He indicates that he reviewed Mr. Butler's medical records from Oceans, Longview Regional Medical Center, and Havencare Nursing and Rehab SNF. Dr. Miller identifies as significant facts that Mr. Butler was a seventy-four year old male with a history of major depressive disorder and dementia for which he had been receiving out-patient treatment. He further states that Mr. Butler was admitted for in-patient treatment at Oceans to better manage his symptoms. He notes that Mr. Butler was a patient at Oceans for less than two weeks in March of 2015 and that, at some point, Mr. Butler had an incident wherein he became confused and may have struck at a staff member. Following this episode, Mr. Butler began showing signs of over-sedation.

According to Dr. Miller, Dr. Cavazos made inconsistent and contradictory progress notes regarding Mr. Butler's condition at various times, such as (1) stating Mr. Butler "has been compliant with medications," but then stating that Mr. Butler "…has been refusing his medications for the past several days," and (2) stating in the discharge summary that "while in this facility the patient was compliant with medications." Dr. Miller notes that thirteen days into his stay, Mr. Butler was transferred from Oceans to Longview Regional Medical Center by ambulance and, upon admission, found to be suffering from mental status changes secondary to medication and over-sedation; as well as acute kidney injury, hypovolemia, and shock liver, all due to dehydration.

Specifically with respect to hydration, Dr. Miller stated that Oceans "should have taken any necessary measures to ensure this patient remained well hydrated at all times." He further states that Oceans was required to

9

recognize and act on an accurate assessment that Mr. Butler was at risk for dehydration as evidenced by his oral intake record, act on the fact that Mr. Butler was totally dependent on staff for both anticipation of needs and physical assistance of all nourishment including fluids, and monitor Mr. Butler's fluid intake and output each shift, which must be done consistently and accurately…to evaluate his fluid needs and response to medications…Oceans Behavioral Hospital …and its staff were further required to discover and consistently record Mr. Butler's urine color, urine odor, and skin turgor, presence of edema, and whether the mucous membranes were moist or dry, timely notify Mr. Butler's physician of changes, specifically weight loss or signs or symptoms of dehydration to prevent further complications, and give Mr. Butler food to eat and water to drink and help him eat and drink.

Dr. Miller further stated that Dr. Cavazos

made progress notes which claimed she personally examined this patient on nearly a daily basis…[A]ny reasonable physician practicing according to the acceptable standards of care would have determined that Mr. Butler was suffering from dehydration early enough to intervene with appropriate treatment, before such a patient began to experience the severe complications that are known to develop from untreated hydration [sic][.]

One case cited by Appellants is *Palacios*, a case involving claims that arose after a patient, who had severe brain damage and had been prescribed bed restraints, fell from his hospital bed. 46 S.W.3d at 876. The expert report cited the nursing notes, which documented that the patient's restraints were on ten minutes before the fall and that he was found on the floor with his restraints on, but not tied to the bed. *Id.* at 879. The report stated that the patient "had a habit of trying to undo his restraints and precautions to prevent his fall were not properly utilized." *Id.* The trial court concluded that the report was insufficient and granted the hospital's motion to dismiss. *Id.* at 876. The supreme court held the expert report was deficient because it did not put the trial court or defendant on notice of what the conduct complained of was, i.e., whether the hospital should have "monitored [the patient] more closely, restrained him more securely, or done something else entirely." *Id.* at 880.

Here, Dr. Miller told Oceans and Dr. Cavazos what was expected of them. *See Baty*, 2018 WL 665456, at *5.[3] According to the report, Appellants should have taken the necessary

---

[3] In *Baty*, the patient's proffered expert report adequately articulated the applicable standard of care for a nurse anesthetist in the administration of anesthesia before cataract surgery, despite conclusory language that a block should be administered "in the proper manner" in order to avoid injuring the eye. *Baty*, 2018 WL 665456, at *5. After explaining that an inadequate initial block attempt increased the risk of optic nerve injury and that a block should be administered in the proper manner, the expert opined that the anesthetist breached the standard of care by "sticking [the optic nerve] with the retrobulbar needle" "during the administration of the retrobulbar block," and

measures to ensure Mr. Butler remained well hydrated at all times. With respect to Oceans, this included (1) recognizing and acting on an accurate assessment that Mr. Butler was at risk for dehydration and was totally dependent on staff for his needs and nourishment, including fluids, (2) monitoring Mr. Butler's fluid intake and output each shift to evaluate his fluid needs and response to medications, (3) discovering and recording Mr. Butler's urine color, urine odor, and skin turgor, presence of edema, and consistency of mucous membranes, (4) timely notifying Mr. Butler's physician of changes, such as weight loss or signs of dehydration, and (5) giving Mr. Butler food to eat and water to drink and helping him eat and drink. With respect to Dr. Cavazos, who noted personally examining Mr. Butler daily, this included determining that Mr. Butler was suffering from dehydration early enough to intervene with appropriate treatment and before he began experiencing the severe complications that are known to develop from untreated hydration. Accordingly, we conclude that Dr. Miller's report provides a fair summary in that it sets out what care was expected and not given. *See id*. Thus, we conclude that Dr. Miller's report adequately articulated the standard of care.[4] *See id.*

**Causation**

Appellants further argue that Dr. Miller's report is deficient because it does not adequately summarize the causal relationship between Appellants' failure to meet the standard of care and Mr. Butler's injuries. Dr. Cavazos argues that Dr. Miller's statements regarding causation are vague and conclusory and do not adequately address how Dr. Cavazos's actions proximately caused Mr. Butler's injuries

A causal relationship is established by proof that the negligent act or omission was a substantial factor in bringing about the harm, and that, absent this act or omission, the harm would not have occurred. *Costello v. Christus Santa Rosa Health Care Corp*., 141 S.W.3d 245, 249 (Tex. App.—San Antonio 2004, no pet.). Causation is often established in medical malpractice cases through evidence of a "reasonable medical probability" or "reasonable probability" that the alleged injuries were caused by the negligence of one or more defendants. *Jelinek v. Casas*, 328 S.W.3d 526, 532-33 (Tex. 2010). In other words, the plaintiff must

---

therefore, if "sticking [the optic nerve] with the retrobulbar needle" was a breach of the standard of care, then "proper manner" necessarily encompassed not sticking optic nerve with retrobulbar needle. *Id*.

[4] Appellants also argue that Dr. Miller's report does not sufficiently articulate the breaches of the standard of care. The report's sufficiency as to the breach elements is tied to its sufficiency as to the standard of care, and for the reasons discussed above, we conclude that Dr. Miller adequately set forth the breaches of the standard of care.

present evidence "that it is 'more likely than not' that the ultimate harm or condition resulted from such negligence." *Id.* (quoting *Kramer v. Lewisville Mem'l Hosp.*, 858 S.W.2d 397, 399–400 (Tex. 1993)). An expert may show causation by explaining a chain of events that begins with a defendant doctor's negligence and ends in injury to the plaintiff. *See McKellar v. Cervantes*, 367 S.W.3d 478, 485 (Tex. App.—Texarkana 2012, no pet.).

A report is deficient if it states only the expert's conclusions about the standard of care, breach of the standard of care, or causation. *See Ortiz v. Patterson*, 378 S.W.3d 667, 671 (Tex. App.—Dallas 2012, no pet.). An expert cannot simply opine that the breach caused the injury. *Van Ness*, 461 S.W.3d at 142; *Jelinek*, 328 S.W.3d at 539. Rather, the report must explain, to a reasonable degree, how and why the breach of the standard of care caused the injury based on the facts presented. *Van Ness*, 461 S.W.3d at 142; *Jelinek*, 328 S.W.3d at 539-40. The report must explain the basis of the expert's statements to link his conclusions to the facts. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002); *see also Taylor v. Fossett*, 320 S.W.3d 570, 575 (Tex. App.—Dallas 2010, no pet.) (expert report must contain sufficiently specific information to demonstrate causation beyond conjecture).

In determining whether the expert report represents a good faith effort to comply with the statutory requirements, the court's inquiry is limited to the four corners of the report. *Christian Care Ctrs., Inc. v. Golenko*, 328 S.W.3d 637, 641 (Tex. App.—Dallas 2010, pet. denied) (citing *Palacios*, 46 S.W.3d at 878). "We may not 'fill gaps' in an expert report by drawing inferences or guessing what the expert likely meant or intended." *Hollingsworth v. Springs*, 353 S.W.3d 506, 513 (Tex. App.—Dallas 2011, no pet.). "We determine whether a causation opinion is sufficient by considering it in the context of the entire report." *Ortiz*, 378 S.W.3d at 671.

Dr. Miller's report, which we previously extensively discussed, sets forth that Mr. Butler was physically healthy and ambulatory when admitted to Oceans under the care of Dr. Cavazos. During his stay at Oceans, he had to be taken to the hospital by ambulance where he was found to suffer from over-sedation and an acute kidney injury, hypovolemia, and shock liver due to dehydration. Dr. Miller states that had Appellants followed the appropriate standard of care and ensured that Mr. Butler remained hydrated, more likely than not and to a reasonable degree of medical and nursing probability and certainty, he would not have suffered from the dehydration and its related complications, including acute kidney injury, hypovolemia, and shock liver. Dr. Miller further states that Mr. Butler's dehydration made him more susceptible to medication side

effects, including those resulting from sedation. He explains that had Appellants intervened with appropriate treatment, Mr. Butler would not have suffered from dehydration and, consequently, would not have suffered from shock liver, hypovolemia, acute kidney injury, encephalopathy, unnecessary worsening of his condition, an extensive hospitalization, pain, mental anguish, loss of dignity, and ultimate death. Therefore, the report links Dr. Miller's statements to the facts and explains, to a reasonable degree, how and why the breach of the standard of care caused the injury based on the facts presented. *See Van Ness*, 461 S.W.3d at 142; *see also Jelinek*, 328 S.W.3d at 539–40; *Bowie Mem'l Hosp.*, 79 S.W.3d at 52.

Nevertheless, Dr. Cavazos argues that Dr. Miller's report is deficient because it fails to account for the other doctors that treated Mr. Butler after he was discharged from Oceans. We disagree. It is apparent from Dr. Miller's report that Mr. Butler suffered from the injuries that led to his eventual death prior to his discharge from Oceans and Dr. Cavazos's care.[5]

Based on the information provided in Dr. Miller's report, as set forth above, we conclude that Dr. Miller's report identifies a chain of events that begins with the defendant's negligence and ends with an injury to the plaintiff. *See McKellar*, 367 S.W.3d at 485. Consequently, Dr. Miller's report is sufficient with respect to the element of causation.

**Summation**

Because Dr. Miller's report adequately addresses the elements of the standard of care, breach, and causation as to at least one of Mrs. Butler's theories of liability, we conclude that the trial court did not abuse its discretion by finding the report to be adequate under Section 74.351 and denying Appellants' motions to dismiss. *See Van Ness*, 461 S.W.3d at 142; *see also Potts*, 392 S.W.3d at 631-32; *Palacios*, 46 S.W.3d at 875. We overrule Appellants' second issue.[6]

---

[5] Dr. Cavazos cites *Columbia Valley Healthcare Sys., L.P. v. Zamarripa* as authority for her argument that Dr. Miller's report does not adequately address proximate cause. 526 S.W.3d 453, 456 (Tex. 2017), *reh'g denied* (Sept. 22, 2017). In that case the supreme court held that the proffered expert reports of a nurse and physician failed to provide a factual explanation as to how the defendant hospital proximately caused the death of a pregnant patient by facilitating the patient's transfer in an ambulance to another facility, during which the patient suffered a placental abruption and cardiac arrest leading to her death. *Id*. at 457. However, in that case, according to one of the expert reports it was the treating physician, not the hospital, that ordered the patient's transfer, and neither expert explained how the hospital permitted or facilitated the patient's transfer or even had a say in the matter. *Id*. at 461-62. Accordingly, we are unpersuaded that *Zamarippa* supports Dr. Cavazos's argument, as Dr. Miller clearly explained that had Dr. Cavazos ensured that Mr. Butler remained hydrated, he would not have suffered from acute kidney injury, hypovolemia, and shock liver.

[6] Because we conclude that Dr. Miller is qualified to opine on the standard of care regarding hydration and because his report meets the Chapter 74 qualifications with respect to the hydration theory of liability, we will not address Appellants' argument with respect to the remainder of Dr. Miller's report. *See* TEX. R. APP. P. 47.1.

13

## CONCLUSION

Having overruled Appellants' first and second issues, we *affirm* the trial court's order denying Appellants' motions to dismiss.

**JAMES T. WORTHEN**
Chief Justice

Opinion delivered March 21, 2018.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(PUBLISH)

14



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**MARCH 21, 2018**

**NO. 12-17-00297-CV**

**OCEANS BEHAVIORAL HEALTHCARE OF LONGVIEW, AUDUBON BEHAVIORAL HOSPITAL OF LONGVIEW, LLC D/B/A OCEANS BEHAVIORAL HOSPITAL OF LONGVIEW AND OCEANS ACQUISITION, INC. AND JAVEN V. CAVAZOS, M.D.,**
Appellants
V.
**NANCY M. BUTLER, INDIVIDUALLY AND AS EXECUTOR OF THE ESTATE OF HUEY D. BUTLER, DECEASED, AND ON BEHALF OF THE WRONGFUL DEATH BENEFICIARIES OF HUEY D. BUTLER,**
Appellee

Appeal from the County Court at Law No 2

of Gregg County, Texas (Tr.Ct.No. 2017-110-CCL2)

THIS CAUSE came to be heard on the oral arguments, appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that all costs of this appeal are hereby adjudged against the Appellants, **OCEANS BEHAVIORAL HEALTHCARE OF LONGVIEW, AUDUBON BEHAVIORAL HOSPITAL OF LONGVIEW, LLC D/B/A OCEANS BEHAVIORAL HOSPITAL OF LONGVIEW AND OCEANS ACQUISITION, INC. AND JAVEN V. CAVAZOS, M.D.,** for which execution may issue, and that this decision be certified to the court below for observance.

James T. Worthen, Chief Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*